The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
December 19, 2024

**2024COA126**

**No. 23CA0897, *Veolia Water v. Antero* — Contracts — Breach of Contract — Terms — Incorporation by Reference; Torts — Economic Loss Doctrine — Intentional Fraud**

A division of the court of appeals holds that in a contract dispute over the construction of a hydraulic fracturing wastewater treatment plant the district court did not err in finding that Veolia Water Technologies, Inc. breached the contract and committed fraud. The division also holds that the district court did not err in considering representations made by Veolia via email and incorporated into the contract via change order when rejecting Veolia's claim that Antero Resources Corporation instead breached the contract. The division also affirms the district court's damages award. Finally, adding to the evolving application of the economic loss rule in Colorado, the division holds that that the rule does not bar Antero's intentional tort fraud claims against Veolia because,

here, Veolia's common law tort duties are independent of its contractual duties and of the implied duty of good faith and fair dealing that exists in every contract.

COLORADO COURT OF APPEALS      **2024COA126**

Court of Appeals No. 23CA0897
City and County of Denver District Court Nos. 20CV31008 & 20CV31009
Honorable Eric M. Johnson, Judge
Honorable Marie Avery Moses, Judge
Honorable Martin F. Egelhoff, Judge

Veolia Water Technologies, Inc.,

Plaintiff-Appellant and Cross-Appellee,

v.

Antero Treatment LLC, Antero Resources Corporation, Antero Midstream
Partners LP, and Antero Midstream Corporation,

Defendants-Appellees and Cross-Appellants.

JUDGMENT AFFIRMED AND CASE
REMANDED WITH DIRECTIONS

Division II
Opinion by JUDGE FOX
Johnson and Schock, JJ., concur

Announced December 19, 2024

Fox Rothschild LLP, Marsha M. Piccone, Risa B. Brown, Denver, Colorado;
Mayer Brown LLP, Nicole A. Saharsky, Minh Nguyen-Dang, Washington, D.C.;
Troutman Pepper Hamilton Sanders LLP, Misha Tseytlin, Chicago, Illinois;
Troutman Pepper Hamilton Sanders LLP, Ralph A. Finizio, Robert A. Gallagher,
Pittsburgh, Pennsylvania, for Plaintiff-Appellant and Cross-Appellee

Lewis Roca Rothgerber Christie LLP, Kenneth R. Rossman, IV, Kendra N.
Beckwith, Denver, Colorado; Davis Graham & Stubbs LLP, James R.
Henderson, Denver, Colorado; Vinson & Elkins, LLP, Marie R. Yeates, James D.
Thompson, III, Stephanie L. Noble, Matthew C. Hoffman, Garrett T. Meisman,
Houston, Texas, for Defendants-Appellees and Cross-Appellants

Hall & Evans, LLC, Nicholas J. Deaver, Denver, Colorado, for Amici Curiae Colorado Defense Lawyers Association, DRI Center for Law and Public Policy, and the Colorado Civil Justice League

Berg Hill Greenleaf Ruscitti LLP, Geoffrey C. Klingsporn, Boulder, Colorado, for Amicus Curiae Gregory Klass

¶ 1     Veolia Water Technologies, Inc. (Veolia), appeals the district court's judgment in favor of Antero Resources Corporation and its subsidiaries Antero Midstream Corporation, Antero Midstream Partners LP, and Antero Treatment LLC (collectively, Antero), and its attorney fees and costs award.

¶ 2     We hold that the economic loss rule does not bar Antero's intentional tort fraud claims against Veolia because, here, Veolia's common law tort duties are independent of its contractual duties and of the implied duty of good faith and fair dealing that exists in every contract.[1] Accordingly, we affirm the district court's judgment and damages award and remand the case so the district court may calculate reasonable appellate attorney fees and costs to Antero.

## I.    Background

¶ 3     This appeal concerns a dispute over a facility designed to treat wastewater from natural gas hydraulic fracturing (fracking) operations located in Pennsboro, West Virginia (Clearwater or the

---

[1] Two amici have filed helpful briefs in this case — one in favor of Antero and the other in favor of Veolia — urging different applications of the economic loss rule to claims for intentional torts like fraud.

facility).[2]  Antero primarily relied on "deep well injection" to discard fracking wastewater in disposal wells, but, as this posed economic, technological, and environmental challenges, it sought an alternative solution.  Antero approached Veolia to design and build Clearwater to separate and crystallize the solids within fracking wastewater to create waste salt to be landfilled, leaving water clean enough to reuse or release into surface waterways.

¶ 4      On October 31, 2014, Veolia provided Antero with a "Bench Scale Proposal" (the Proposal) for conducting preliminary experiments to test Veolia's processes and inform the potential construction of a treatment facility.  Antero authorized the work reflected in the Proposal on November 26, 2014, and paid Veolia $355,000 for this preliminary testing and analysis.  Antero later twice authorized interim "Limited Notice to Proceed" (LNTP) agreements with Veolia, thus allowing Veolia to continue its

---

[2] Veolia and Antero contractually agreed to litigate any suits related to the facility in federal court in Denver, Colorado.  But the federal court lacked jurisdiction as diversity does not exist between the two companies.  As a result, the parties litigated the case in Colorado state court.

preliminary testing and improve its design before reaching a final agreement. Antero paid Veolia $750,000 for each LNTP.

¶ 5    On August 18, 2015, Antero and Veolia entered into the "Design/Build Agreement" (DBA), the principal contract governing Clearwater's construction. The DBA also explicitly provided that the DBA, the Proposal, and the two LNTPs "set[] forth the entire agreement between the Parties" unless the DBA was later modified via written "Change Orders" executed by both parties. The DBA specified that Veolia would be responsible for Clearwater's design and construction as a "turnkey facility." Antero agreed to pay Veolia $255,765,253[3] (plus or minus additions or deductions identified in the DBA) once Clearwater was completed. A Veolia subsidiary, Veolia Water North America Operating Services, LLC (VNA), would then operate the facility within specified guidelines.

¶ 6    As relevant here, the DBA contained two key requirements for Clearwater, one relating to the characteristics of the waste salt and the other relating to the facility's power consumption. First, adding to the Proposal's representation that Veolia's proprietary CoLD

---

[3] The DBA's original contract price was $239.8 million, but the contract price was modified by a later executed change order.

process would provide a "zero liquid waste process" that could treat wastewater to leave "a stable, non-hazardous solid for disposal and/or re-use," the DBA provided that the waste salt's "Free Liquids" requirement was "Pass, No free liquids." The waste salt's "Total Solids" requirement was "no limit, must pass paint filter test." Second, the DBA restricted Clearwater's power consumption from exceeding 505,500 kWh/day with its "chillers" on or 340,000 kWh/day with its chillers off. Both requirements later proved problematic.

## A. Waste Salts

¶ 7    To treat wastewater influent using Veolia's CoLD process, the facility required lower temperatures than other treatment methods and used three main stages. First, a "pretreatment" stage separated grit and solids from the influent. Then, a thermal "crystallizer train" treatment heated the influent to evaporate and concentrate the wastewater before centrifuges separated the waste salt from the water. The final "post treatment" phase sanitized the separated water and removed any remaining contaminants.

¶ 8    The second stage of this process used four sequential chambers, or "effects," where wastewater was heated and

4

crystallized waste salt was separated. In Veolia's original design for Clearwater, the fourth effect used a single chamber, but on August 26, 2015 (after the DBA was executed), Veolia proposed a design alteration, later designated as "Change Order 1" (CO-1).

¶ 9　As a cost-saving measure, Veolia proposed that it be allowed to "split" the fourth effect into two separate chambers, chambers 4A and 4B — each producing different waste salts — to decrease power usage by reducing the need for the power-demanding "chillers."

¶ 10　Antero was concerned about this change, however, as it wanted to ensure that the waste salt Clearwater produced would be dry because Antero planned to dispose of it in a landfill near Clearwater. In the Proposal — expressly incorporated into the DBA — Veolia promised to produce a stable and nonhazardous solid waste salt. Relatedly, Antero's landfill application, prepared in October 2016 and February 2017 with its landfill contractor, advised regulators that Antero anticipated the waste salt would be a "fine[-]grained" "sand material" that could be sufficiently compacted

by bulldozers and earthmoving equipment driving over it without the need for additional processing or solidification.[4]

¶ 11     Consistent with what Veolia promised in the Proposal it could deliver to Antero, Veolia's meeting minutes (of weekly Antero/Veolia calls) dated September 22, 2015, noted that the waste salt would "teepee" (i.e., pile up in a conical shape) in the truck in which the salt was being loaded, requiring the truck to move periodically. Again, in a September 29, 2015, email, Veolia employees explained that one of 4B salt's characteristics would be an "angle of repose" (the salt teepee's angle) of "41.5° +/- 3.5°" — consistent with generating solid salt.

¶ 12     In a September 1, 2015, email, attached as an exhibit to CO-1, Veolia's Project Director, Michael Pietropaoli, represented that splitting the fourth effect into two chambers would not change the waste salt's quality. But, unbeknownst to Antero, Veolia was aware

---

[4] Because of the waste salt's propensity to absorb water from the air, to prevent liquification over time Antero planned to mix native soil into the salt or cover it with soil or tarps to avoid absorption, but did not plan to use additives to "solidify" the waste salt. In a "risk register" Veolia provided to Antero two months before CO-1 was signed, the risk of waste salt leaving the 4B effect as a liquid was not included — though the document did highlight that salt "[m]aterial can turn to mush if exposed for too long."

that splitting the fourth effect risked causing the 4B waste salt to be too unstable for Antero's landfill plans. VNA (which would later operate Clearwater) warned Veolia on August 26, 2015 (the same day Veolia sent Antero the request to split the fourth effect) of concerns with the 4B salt, noting, "How will a truck from [4B] behave after sitting and/or after handling? While technically we need to meet paint-filter at the centrifuge, we will all be in trouble if [4B] material melts anywhere between the centrifuge and the landfill." Yet Veolia did not communicate these risks to Antero before the DBA and CO-1 were executed.[5]

¶ 13    Having been assured of the stability of the waste salt leaving the 4B effect, Antero approved splitting the fourth effect, thus modifying the DBA per CO-1 on December 16, 2015.[6]

¶ 14    Clearwater began treating wastewater and producing waste salt in 2017. While the 4A waste salt was solid as anticipated, the

---

[5] Well after the August 2015 DBA and the December 2015 CO-1, a Veolia employee told an Antero employee in a March 2016 email that the 4B salt would "not be granular" and would "carry more moisture."

[6] Antero's signature on CO-1 is dated "12/16/18," while Veolia signed it on "1/8/16." Testimony at trial indicated that the 12/16/18 date was a typo, as "Change Order 2" was signed in June 2016.

4B waste salt was consistently "soupy." Because the 4B salt was so wet and unstable, Antero was unable to landfill waste salt from the 4B effect without mixing in significant and expensive amounts of "fly ash" (a fine powder residue produced from burning coal), which Antero's initial landfill permit prohibited.

¶ 15    Antero's expert, Dr. Hubert Fleming, testified that the soupy salt was likely the result of the split fourth effect, which caused the 4B effect to have a higher ratio of calcium chloride to sodium chloride than anticipated because most of the sodium chloride was removed in the 4A effect. This prevented sodium chloride from producing a "stabilizing" effect on the calcium chloride that could have occurred had they been treated within a single fourth effect. The 4B salt issue was never resolved and Antero canceled the DBA on September 12, 2019, after Veolia informed Antero that the salt issue would not be resolved and disclaimed responsibility. Antero subsequently halted operations at Clearwater, "mothballing" the facility.

## B.    Power Consumption

¶ 16    Veolia split the fourth effect to meet the DBA's power consumption guarantee for Clearwater. Power consumption directly

8

affected Clearwater's economic viability. The power consumption guarantee changed several times as the DBA was negotiated and as the plan to split the fourth effect took shape.

¶ 17    On May 20, 2015, Veolia calculated that Clearwater's total expected power usage would be 395,759.4 kWh/day (with chillers on) to treat 60,000 barrels of wastewater per day. This estimate assumed that Clearwater would require seven chillers (six active chillers with one nonactive backup chiller) running twenty-four hours a day for 105 days per year. Brad Biagini, a former senior process engineer with Veolia, testified that the chillers represented a significant portion of the facility's power needs, "on the order of 40[%] of the overall power demand."

¶ 18    In a draft power consumption guarantee Veolia sent to Antero on August 6, 2015, shortly before the DBA was executed on August 18, Veolia proposed an increased power guarantee of 450,615 kWh/day with chillers on and 278,615 kWh/day with chillers off. But internal Veolia emails dated August 10 and 11, 2015, indicated that Veolia had underestimated its chiller needs and feared it might surpass its most recent, increased power guarantee limits. Mark Wozniak, Veolia's senior engineering advisor, informed managers

that, based on his calculations, two more chillers (totaling nine active chillers) would be required — a significant power increase that would exceed the then-current power guarantees. When Lnsp Nagghappan, VNA's vice president of business development, learned of this, he responded to Veolia: "Why this increase at the last minute. We changed power multiple times. We had a tough time 2 weeks ago when we increased power demand by 20%. Now another increase. Can we optimize the design to avoid this increase." Jim Rieke, Veolia's director of process design, noted, "This is extremely upsetting. We knew that this interface point was important to get right and still somehow dropped the ball. Now we might not have an option but to split the 4th effect."

¶ 19    Veolia's internal meeting minutes from an August 11, 2015, team meeting indicate that the change to split the fourth effect was to address this increase in power demand. The header read, "Chiller Power — There is an issue with the current design — it exceeds power requirements and we are investigating a work around by splitting the 4th Effect in half." The meeting notes further documented, "If we split the 4th Effect, there is an opportunity to save $1mm . . . for the redesign. If we do nothing,

we need to put in 2 more chillers and are over our power requirements." The minutes recommended, "Downplay the splitting change, no warranties would change and the benefits of less power consumption . . . . No more than 4 chillers are needed, if we proceed with the 4A/4B option."

¶ 20 On August 13, 2015, Veolia proposed to Antero the later finalized power guarantee in the DBA of 505,500 kWh/day with chillers on and 340,000 kWh/day with chillers off. Later that day, Biagini sent Veolia employees an updated power usage projection, assuming ten chillers (with one nonactive backup) would be running twenty hours a day for 105 days per year and including a 10% "safety factor" to account for unanticipated power needs, now totaling 498,020 kWh/day (or 452,745 kWh/day without the safety factor).

¶ 21 Wozniak's reply noted that, according to his calculations, the power rate could be nearly 20,000 kWh/day higher than Biagini estimated before applying the 10% safety factor. Or — assuming the absolute maximum power rate that the chillers could run (as the manufacturer represented) — the rate could be 34,511

kWh/day higher (though Biagini argued that the 10% safety factor would not be added to the maximum power rate).

¶ 22    While Biagini agreed with Wozniak's calculations, he noted that a difference between their analyses was that Biagini looked at predicted power rates that assumed Clearwater's "final completion performance test" (FCPT) would be conducted in cooler months (November to February).  Thus, Biagini's predictions were based on a lower energy demand, so his "chillers on" analysis was more conservative (hence the twenty-hour-a-day run time), while Wozniak was looking at energy use in summer months with a higher energy demand.  None of the information contained in Veolia's internal meeting notes or emails was shared with Antero before the execution of CO-1.

¶ 23    Despite ongoing power concern conversations and the risk identified in the emails that the chillers would exceed Veolia's power consumption guarantee, the DBA was executed days later on August 18, 2015, and included a power guarantee of 505,500 kWh/day with chillers on or 340,000 kWh/day with chillers off.  But when CO-1 was implemented, Veolia proceeded with the new

split fourth effect design, significantly reducing the number of chillers required.

### C. Mechanical Failures and Contractual Delays

¶ 24    In operation, Clearwater faced repeated mechanical failures that led to outages, prevented Clearwater from reaching its full operating capacity, and caused frequent shutdowns. Antero's director of water operations, Conrad Baston, testified to several problems the facility faced, including, for example, the following:

- "[B]elt presses" meant to last "months or a year" tore and broke within days, causing sludge from the pretreatment stage to build up and overflow into the thermal train.

- "[S]tructural steel" design repairs to "prevent collapse" caused a month-long shutdown.

- Repairs to "thermal oxidizers" were required to prevent volatile organic compounds from escaping into the atmosphere.

- The facility produced treated effluent that surpassed "chronic toxicity" testing limits and thus could not be discharged into the surface water.

- "[S]olid contact clarifier" (SCC) rakes seized multiple times due to overly dense sludge, causing immediate shutdowns so sludge could be vacuumed out of the pretreatment chambers, an issue that continued through March 2019, just two weeks before Veolia's first "substantial completion performance test" (SCPT) attempt.

¶ 25 According to Fleming, Antero's expert, the "design basis" for Clearwater was not based on the water samples that Antero provided. Instead, it employed a "midpoint design basis" that tried to calculate the expected average constituents in Antero's wastewater rather than testing the provided water samples to determine the actual minimum and maximum ranges of constituents. Fleming testified that the midpoint design basis did not conform to prudent industry standards because the facility would not be appropriately designed to treat wastewater with low or high ranges of contaminants; instead, the facility would only function at the *assumed* single average contaminant level.

¶ 26 VNA and an external third-party report (commissioned by Veolia) detailed ways to help fix the problems at Clearwater, but

Veolia passed on implementing the recommended mitigation measures.

¶ 27 Between the 4B waste salt problems and mechanical and design failures, Clearwater never met some of the DBA's crucial contractual "milestones." Most importantly, by September 23, 2017, Clearwater had to pass a SCPT, and by December 12, 2017, it had to pass a FCPT.

¶ 28 Veolia attempted two SCPTs, the first in March 2019 and the second in August 2019, and argued Clearwater had passed. Antero disagreed and, regardless, contended that Veolia had not completed the required "Work" under the DBA or met the SCPT process requirements.

¶ 29 The DBA defined Veolia's required "Work" as "the design, project management, supervision, procurement, construction, testing, commissioning, startup, and, during the Interim Operations Period, operation and maintenance . . . described in this Agreement for the turnkey supply by Veolia to Antero of the Facility in accordance with the Scope of Work hereunder."

¶ 30 Regarding the waste salt specifically, the parties contested whether the waste salt met the paint filter test and the DBA's

requirements. Veolia informed Antero on August 29, 2019, that it wished to proceed with a FCPT on September 16, 2019. Protesting that Veolia's Work had not been completed and that Clearwater had not passed a SCPT, Antero terminated the DBA on September 12, 2019.

## II. The District Court's Findings

¶ 31 Veolia and Antero separately sued each other in March 2020, and the cases were consolidated. As relevant here, Antero brought claims for breach of contract and fraud. After a lengthy bench trial, the district court issued detailed findings of fact and conclusions of law.

¶ 32 The district court found that Veolia breached the DBA by failing to meet the DBA's SCPT and FCPT deadlines. It found that, even if Veolia had completed a SCPT, it never completed a FCPT. As a result, the district court found that, per DBA article 16.4.2, even if Veolia had passed the SCPT in March 2019, delay liquidated damages (DLDs) began to accrue and hit the DLD cap (10% of the DBA's value) in June 2019, causing Veolia to default.

¶ 33 The district court also found that Veolia breached the DBA and CO-1 by failing to provide compliant 4B waste salt. The district

16

court found that CO-1 created specific salt requirements when it incorporated by reference Pietropaoli's September 1 email (Exhibit 1 to CO-1). The soupy salt leaving the 4B centrifuge could not be placed in a landfill without solidification, thus violating the terms of the DBA (and CO-1).

¶ 34 The district court further found that Veolia failed to construct Clearwater in accordance with "[p]rudent [i]ndustry [p]ractices" as defined by the DBA, failed to deliver to Antero a turnkey facility, and did not complete the Work required by the DBA. This, along with Clearwater's failure to produce compliant waste salt, meant that Veolia had breached the DBA (and CO-1).

¶ 35 As for Antero's fraud claims, the district court first found that Veolia fraudulently induced Antero to sign the DBA by failing to disclose that Clearwater could not meet the power consumption guarantee while misrepresenting otherwise and by failing to disclose why it was redesigning Clearwater to split the fourth effect. The district court also found that Veolia fraudulently induced Antero into signing CO-1 because it failed to disclose the risks of splitting the fourth effect while "fraudulently representing it would deliver stable, solid salt waste."

### III. The District Court's Damages Award

¶ 36    The district court found that the "economic loss rule" did not bar Antero's recovery of damages for fraud. It reasoned that the economic loss rule did not apply because, at the time of Veolia's misrepresentations, there was no contract with Antero because the Proposal and the LNTPs did not form a "network of interrelated agreements."

¶ 37    In determining the amount of damages, the district court first found that a "benefit-of-the-bargain" approach was the proper measure of damages for both Antero's breach of contract and fraud claims. The court generally credited the damages calculation from Dr. Stephen Becker, Antero's damages expert, totaling $253,309,102, but it applied a "discount rate" in the range suggested by Michael Emmert, Veolia's damages expert, to reduce that amount to $144,105,246. The district court also rejected the argument that this benefit-of-the-bargain approach was actually a form of lost profits damages, or "consequential damages," which the DBA barred.

¶ 38    The district court next awarded Antero its incremental out-of-pocket costs — costs Antero would not have incurred had

Clearwater been designed and delivered in accordance with the DBA. Becker testified that these costs amounted to $88,657,845. The district court agreed for the most part and found that Antero had proved these costs by a preponderance of the evidence, less $16,646,795 in expenses incurred after December 2017 for "trucking, pit and commissioning expenses," resulting in incremental out-of-pocket damages of $72,011,50.

¶ 39 Turning to Antero's unpaid DLDs, the court found that Veolia failed to prove that the delays were attributable to Antero, and because it was undisputed that Veolia failed to meet the DBA's critical milestones, the court determined that Antero was entitled to $25,576,525 in unpaid DLDs. The court also found that Antero was entitled to attorney fees.

¶ 40 The district court then moved to the DBA's limitation on damages in article 25.2, providing that "in no event shall Veolia be liable, alone or in the aggregate, to Antero for any Losses in excess of an amount equal to sixty (60%) of the Contract Sum" ($153,459,152.35), except for, as relevant here, any liability arising from "gross negligence, fraud or willful misconduct." The district court found that Veolia had fraudulently induced Antero to execute

19

the DBA and CO-1 and that Veolia's design and operations of Clearwater, the facility's mechanical failures and salt issues, and Veolia's failure to implement any recommended changes constituted gross negligence and willful misconduct. It thus concluded that the DBA's liability limitation did not apply.

¶ 41    The district court therefore ordered that Veolia pay the (1) benefit-of-the-bargain damages; (2) incremental out-of-pocket damages; and (3) DLDs. In sum, the district court awarded the following damages to Antero:

| Damages Category | Amount |
|---|---|
| Benefit-of-the-Bargain Damages | $144.1 million |
| Incremental Out-Of-Pocket Costs | $72.0 million |
| Delay Liquidated Damages | $25.6 million |
| Subtotal | $241.7 million |

¶ 42    When Veolia later pointed out that Antero owed an unpaid balance of $26.6 million under the DBA, the district court reduced Antero's damages by that amount for a final subtotal of $215.2 million (before pre- or post-judgment interest).

20

## IV. Issues on Appeal

¶ 43     On appeal, Veolia raises five main contentions: (1) the district court erred by creating a new waste salt requirement when it incorporated the emails included as exhibits to CO-1 into the DBA; (2) the district court erred by finding that Antero did not breach the DBA by providing influent with "abnormal substances"; (3) the economic loss rule barred Antero's fraud claims, and, regardless, the DBA's damages cap could not have been reached, so the court did not need to reach Antero's fraud claims; (4) Veolia never fraudulently induced Antero into signing the DBA or CO-1; and (5) the district court erred by using a benefit-of-the-bargain approach, instead of a cost-of-repair approach, in calculating Antero's damages.

¶ 44     Veolia also argues, in the alternative, that the district court's approach to determining Clearwater's market value applied the wrong legal standards.  Veolia also requests appellate attorney fees per the DBA.

¶ 45     Antero, in turn, disputes each contention and urges us to affirm the district court.  Antero's "conditional" cross-appeal argues that if we conclude that the district court's benefit-of-the-bargain

21

damages approach (which incorporated future income considerations) is a form of lost profits or consequential damages otherwise barred by the DBA, then the DBA's article 25 damages limitation exception should apply. Antero also requests appellate attorney fees.

<h2 style="text-align:center">V.    Waste Salt Breach of Contract</h2>

¶ 46    Veolia contends that the district court erred by finding that Veolia breached the DBA by producing 4B waste salt that did not meet the DBA's requirements. Focusing on the waste salt's chemical composition, Veolia argues that that the DBA's "Table 2" clearly identified the required waste salt composition; and the only moisture requirement was that the salt not contain "free liquids."[7] Veolia further argues that free liquids are tested with the paint filter test, which it contends was consistently met.

¶ 47    Yet the district court found that Veolia breached the DBA because it never satisfied the requirements in Pietropaoli's September 1, 2015, email (Exhibit 1 to CO-1). Because the email

---

[7] Veolia also contends that Table 2's "Total Solids – no limit, must pass paint filter test" requirement means that the paint filter test is the only liquid/solid waste salt specification.

was incorporated into the DBA, it imposed express requirements, and the court found that "the Parties' indisputable intent was to include the . . . September 1, 2015 email, and the other emails and documents attached as Exhibit 1, as part of the terms of [CO-1]." Because the 4B waste salt never met the salt's physical state requirement, the district court found that Veolia breached the DBA.

## A. Standard of Review

¶ 48 "The interpretation of a contract is a question of law that we review de novo. Whether contract terms have been incorporated by reference into a contract is also a question of law subject to de novo review." *French v. Centura Health Corp.*, 2022 CO 20, ¶ 24 (citation omitted). We defer to the district court's factual findings "unless they are clearly erroneous." *Id.*

¶ 49 When "interpreting a contract, our primary goal is to give effect to the parties' intent." *Id.* at ¶ 25. And "it has long been settled that contracting parties may incorporate contract terms by reference to another document. In Colorado, for an incorporation by reference to be effective, 'it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms.'" *Id.* at ¶ 29 (citations omitted).

¶ 50    So, for extrinsic terms to be incorporated into a contract by reference "the terms to be incorporated generally must be clearly and expressly identified," while "[g]eneral or oblique references to a document to be incorporated, in contrast, are usually insufficient to support a finding that the document was incorporated by reference." *Id.* at ¶¶ 30-31.

## B.    Analysis

¶ 51    We conclude that the terms detailed in Pietropaoli's September 1 email were added to the DBA as part of CO-1 and created specific requirements for the waste salt consistent with Veolia's obligations. The record supports the district court's finding that Veolia breached the DBA by failing to meet these physical property requirements.

¶ 52    CO-1 first mentioned the emails to be incorporated in its introductory recitals, which provided, in part, as follows:

> (1) Veolia identified and presented to Antero the following design optimizations and associated changes to . . . material of construction optimization, as described under Section "*Corrosion Risk Reduction Discussion*" of Veolia's letter dated August 26, 2015 and subsequent email by Veolia dated September 1, 2015 Included in Exhibit 1 . . . .
>
> (2) Antero and Veolia . . . reviewed and agreed to the proposed design optimizations, per

24

Veolia . . . and Antero's emails dated September, 3, 2015 Included in Exhibit 1 . . . .

Pursuant to Section 5.1 of the Agreement, Veolia and Antero hereby agree to the following changes to the Agreement.

The exhibits attached to CO-1 detailed specific changes to the DBA.

¶ 53    Exhibit 1 contained the September 3, 2015, emails from Mark Kachmar, Antero's manager of completions and water, and John Brinker, VNA's vice president of major projects. Kachmar's email explained, regarding the fourth effect split, that "Antero approves the described design changes as proposed in the 8/26/15 technical memo and *supported by the emails below* describing that no cost or schedule impacts to either the [Veolia] or VNA contract will occur due to these changes." (Emphasis added.) Brinker's email stated, "VNA confirms the design change is acceptable with no changes to our contractual obligations, performance guarantee or price required."

¶ 54    Pietropaoli's September 1 email, included below these statements, made several representations about the fourth effect split redesign, "confirming," for example, that "the design change can be implemented with no additional cost over the contracted

25

value" and "that the design change does not [compromise] Antero's ability to recover byproducts in the future when compared to the originally contracted scope."

¶ 55    Most importantly, it provided,

> Veolia confirms that the salt quality from 4B will be suitable stable for the envisaged landfill strategy.  This is based on previous test work at similar ratios of NaCl to CaCl2-2H2O (1:1 ratio) that were likely to occur with separate removal of an NaCl byproduct salt.  This test work showed 4 hours plus stability at worst case temperature/humidity before visible signs of liquefaction began to occur.

¶ 56    Pietropaoli unambiguously confirmed that the 4B waste salt would be "suitable stable" so that it could be landfilled.  And Pietropaoli added that this confirmation was based on previous testing.  Antero and Veolia knew the terms Pietropaoli referenced and understood that Veolia's representations would bind it.  *See French*, ¶ 29.  Indeed, Kachmar specifically noted that Antero approved the design change "supported by the emails below."

¶ 57    These are not general or vague references to unknown or unidentified documents or terms; the documents were explicitly named in CO-1's recitals and were included as an exhibit to CO-1.  *Cf. id.* at ¶¶ 32-35 ("chargemaster" document not incorporated by

26

reference when one party had no knowledge of its existence or terms). CO-1 evidences the parties' intent to add these representations to the DBA, consistent with what Veolia understood, and Antero expected. *See id.* at ¶ 25. Indeed, in the Proposal, incorporated into the DBA, Veolia represented that its CoLD process could produce a "stable, non-hazardous solid for disposal and/or re-use."

¶ 58 Veolia argues, however, that the introductory recitals cannot extend contractual obligations and that only the changes on page two of CO-1 — detailing the "description of change" information and referencing the exhibits — can be considered explicit changes, and page two does not mention waste salts. But this restrictive reading of CO-1 is not supported by the plain language of its second page.

¶ 59 The second page provides that "[t]he preliminary Drawings & Lists Included in Appendix A to Exhibit D of the Agreement will be updated to reflect the aforementioned design optimizations." These optimizations include the ones "Antero and Veolia . . . reviewed and agreed to" in the "emails dated September 3, 2015 included in Exhibit 1." More specifically, the optimizations included the "implementation of a flow scheme and resulting equipment

27

changes, as described in Veolia's letter dated August 26, 2015 *included in Exhibit 1*" and "material of construction optimization, as described under Section '*Corrosion Risk Reduction Discussion*' of Veolia's letter dated August 26, 2015 *and subsequent email by Veolia dated September 1, 2015 Included In Exhibit 1*."  (First and third emphases added.)  Pietropaoli's September 1 email says that "Veolia confirms our technical preference for the use of carbon steel materials for the recirculation ducts of all vessels except 4B in order to reduce corrosion risks."  The incorporation of the exhibits, which reference waste salt, into the recitals and express changes detailed in CO-1 indicate that Veolia's rigid interpretation does not reflect the parties' intent.

¶ 60    Veolia also argues that, in context and when read as a whole in accordance with the DBA, the "suitable stable" language from the September 1 email did not add new salt requirements; it merely reaffirmed existing requirements in the DBA (i.e., passing the paint filer test), and the email was too vague to impose a new requirement.  But the suitable stable language clarified a specific requirement — that the salt be stable and landfillable — consistent with what Veolia's Proposal promised — that was incorporated into

the DBA. The September 1 email detailed Veolia's previous testing, which showed that the waste salt would remain stable for at least four hours in the worst temperature and humidity conditions.

¶ 61 The September 1 email reiterated a specific requirement for the 4B waste salt that was clearly and expressly detailed in CO-1 — incorporating this requirement effectuates the intent of the parties. *See id.* at ¶¶ 30-31. Thus, because Veolia violated this requirement by producing soupy salt that was not suitable and stable to be landfilled, it breached the DBA.[8] The district court did not err by finding that Veolia breached the DBA by producing 4B waste salt that failed to meet DBA requirements.

## VI. Other Contractual Breaches

¶ 62 Veolia next argues that the district court erred by finding that Veolia breached the DBA by failing to build Clearwater in accordance with "[p]rudent [i]ndustry [p]ractices," failing to meet its contractual milestone deadlines, failing to deliver to Antero a turnkey facility, and failing to complete the Work required by the

---

[8] We consequently need not reach Antero's alternative contention that, regardless of whether the terms were incorporated by reference, the soupy salt nevertheless violated the DBA's "no free liquids" requirement for waste salt.

29

DBA. Veolia also argues that the $26.5 million DLD cap would have applied regardless.

¶ 63 Veolia argues that the district court clearly erred in its factual findings and that Antero failed to present any proof of damages because it failed to present cost-of-repair calculations (which we address *infra* Part IX.B). Veolia also argues that its failure to meet Clearwater's contractual milestones was due to delays Antero caused by providing wastewater with abnormal substances.

## A. Standard of Review

¶ 64 "[W]e review the trial court's factual findings for clear error, 'meaning that we won't disturb such findings if there is any evidence in the record supporting them.'" *Heights Healthcare Co. v. BCER Eng'g, Inc.*, 2023 COA 44, ¶ 39 (citation omitted). "Evaluation of the credibility of witnesses, including expert witnesses, is a matter solely within the fact finding province of the trial court, and we will not reweigh testimony or reevaluate evidence on appeal." *In re Estate of Romero,* 126 P.3d 228, 231 (Colo. App. 2005).

¶ 65 Veolia repeatedly asks that we apply "heightened scrutiny" to the district court's factual findings as the court's order used large portions of Antero's proposed findings of fact and conclusions of law

verbatim. *See Trask v. Nozisko*, 134 P.3d 544, 548-49 (Colo. App. 2006). But while the district court's order extensively relied on portions of Antero's proposed findings of fact and conclusions of law, it did not simply adopt Antero's proposal without careful scrutiny. Comparing the district court's order and Antero's proposed order reveals that the district court fine-tuned the final order, added its own analysis and assessments of witnesses' credibility, and came to its own conclusions about Antero's damages. Therefore, when the record supports the district court's conclusions and indicates the basis for its decisions, we cannot overturn its factual findings. *Heights Healthcare*, ¶ 39.

## B. Analysis

¶ 66    To support its finding that Veolia failed to conform to prudent industry practices when building Clearwater, failed to provide a turnkey facility, failed to complete the required Work, and failed to meet the contractual milestones in the DBA, the district court looked to several overlapping pieces of evidence. The court found that prudent industry practices meant

> (1) ensuring that the Facility's design basis
> adequately reflected the Facility's purpose;
> (2) aligning the process and equipment

31

> validated in bench and pilot testing with the Facility ultimately constructed; (3) installing appropriate materials, machinery, and instrumentation for the Facility; and (4) ensuring that the Facility was a safe place to work.

Trial testimony and exhibits support this finding.

¶ 67    As evidence of Veolia's failure to adhere to prudent industry standards, the district court pointed to, among other things, the limitations in Clearwater's "midpoint design basis" (that is, assuming an average constituent level for the influent to be treated); mechanical problems (including structural steel repairs necessary to prevent structural collapse); frequent shutdowns from problems such as the SCC rake seizures; and Clearwater's failure to produce compliant waste salt from effect 4B.  Tellingly, Robert Cook, VNA's senior vice president of engineering and technology development, described the situation as a "fiasco."  The record supports all of these findings.

¶ 68    Veolia asks us to second-guess the district court's factual findings on these issues.  But we must defer to the district court's factual findings as they have record support, and we may not

reweigh conflicting evidence. *See Heights Healthcare*, ¶ 39; *Romero*, 126 P.3d at 231.

¶ 69    Veolia also argues there is no basis for the district court's findings that it breached the DBA by failing to deliver a turnkey facility and by failing to complete the required Work, as the court's findings regarding these breaches were "lumped" together with its findings related to the prudent industry practices breach. But the record evidence supporting the failure to adhere to prudent industry practices also supports the district court's findings that Veolia never delivered a turnkey facility and, thus, had not completed its Work under the DBA.

¶ 70    While the DBA does not define "turnkey," Black's Law Dictionary defines it as a product "provided in a state of readiness for immediate use." Black's Law Dictionary 1833 (12th ed. 2024). The facility Veolia provided, which could not produce contractually compliant waste salt, suffered frequent mechanical issues requiring immediate shutdowns, and was not designed to treat the full range of influent wastewater, was not ready for immediate use. And because Veolia's Work under the DBA required it to provide a turnkey facility, both of the district court's breach findings are

supported.  We must therefore affirm the district court's factual findings on these contract breaches as well.  *See Heights Healthcare,* ¶ 39; *Romero,* 126 P.3d at 231.

## VII.   Veolia's Abnormal Substances Claim

¶ 71    The district court also rejected Veolia's argument that Antero breached the DBA, and caused the disruptions to Clearwater's operations, by providing influent containing "abnormal substances" — specifically guar gum, scale inhibitors, and biocides.

¶ 72    Clearwater was designed to treat "Compliant Influent" wastewater, defined as wastewater that met the DBA's influent specifications and did not contain "abnormal substances." Abnormal substances are defined, in part, as any "substances or materials" in the influent not identified "in Table 1 of Appendix A of this Exhibit B" of the DBA, if Veolia could demonstrate "with reasonable supporting evidence" the unidentified substance (1) was material; (2) did not result from Veolia's actions; and (3) materially disrupted Clearwater's operations.

¶ 73    The district court rejected Veolia's arguments for six reasons. It found that Veolia, first, failed to prove that the influent was noncompliant and, second, failed to show that the influent caused a

material impact on Clearwater's operations. It noted that it interpreted Table 1 to be a list of "constituents of elemental water chemistry," not a list of specific products, and Veolia failed to show the existence of noncompliant elemental constituents in the influent. It also found that the substances Veolia alleged may have been disrupting Clearwater were captured in the "Total Organic Carbon" (TOC) parameter in Table 1. The district court also noted that Veolia failed to show that any of these chemicals had materially affected Clearwater's operation. And, finally, the district court found that Veolia failed to prove that any material disruptions did not result from its own actions. Alternatively, the district court found that Veolia failed to seek a CO (which it had done many times for other reasons) to modify the DBA or the project schedule after it alleged that abnormal substances affected Clearwater's operations, and therefore Veolia had waived the contention.

¶ 74 Veolia argues that it proved that Antero caused the presence of guar gum, biocides, and scale inhibitors and that these substances materially impacted Clearwater's operation. But the district court highlighted conflicting evidence in the record on these points. It noted, for example, that Veolia itself added chemicals to the influent

35

similar to the alleged abnormal substances that could have caused the claimed disruptions. And Clearwater's design caused even small amounts of these chemicals to become further concentrated as water was recycled and reused throughout different portions of the plant. These findings enjoy record support, and we may not reweigh conflicting evidence; thus, the district court did not err. *See Heights Healthcare,* ¶ 39; *Romero,* 126 P.3d at 231.

¶ 75 Veolia also objects to the district court's interpretation of Table 1 and the "abnormal substances" not identified in Table 1. Veolia contends that the district court erred by concluding that Table 1 lists "constituents of elemental water chemistry" rather than specific categories of chemical products or specific chemical products and by finding that the alleged abnormal substances were part of TOCs listed in Table 1.

¶ 76 We agree with the district court's interpretations. *See French,* ¶ 24. As for the "constituents of elemental water chemistry" point, testimony at trial supported framing Table 1 as a list of "constituents." Indeed, TOCs are listed under the broader subheading of "other constituents." More importantly, Table 1 does not list specific chemical products — it lists acceptable ranges of

broader types of chemicals or elements, and testimony at trial supports the district court's finding that guar gum, scale inhibitors, and biocides fall under TOCs, not abnormal substances.

¶ 77    Dr. Jennifer Hornemann, Antero's vice president of production, testified explicitly that biocides, guar gum, and scale inhibitors are captured in Table 1 under the TOC category, a position supported by academic research presented to the district court.  *See* David N. Harry et al., *Method for Estimating and Analyzing for TOC of Hydraulic Fracturing Fluids* 1-6, 9 (2017), https://perma.cc/8TGL-TDTJ.  Thus, because the substances Veolia highlights are included in Table 1,[9] they are not abnormal substances.  And, again, we may not reweigh competing evidence on this point.  *See Heights Healthcare*, ¶ 39; *Romero*, 126 P.3d at 231.

¶ 78    Because Veolia's abnormal substances claim fails on the merits, we need not address Veolia's alternative contention that the district court erred by finding that Veolia waived this claim by failing to seek a change order.

---

[9] Testimony at trial also showed that the TOC levels in the influent never surpassed the maximum range specified in Table 1.

## VIII.  Fraud

¶ 79    Veolia next contends that the district court erred by finding that the economic loss rule did not bar Antero's fraud claims and contends that the court need not have reached the fraud claims at all because the damages would not have exceeded the DBA's damages cap regardless.

### A.    The Economic Loss Rule

¶ 80    "'Whether the economic loss rule precludes a particular claim raises a legal issue subject to de novo appellate review.' 'The existence and scope of a tort duty is a question of law to be determined by the court.'" *In re Estate of Gattis*, 2013 COA 145, ¶ 10 (citations omitted).

¶ 81    In *Town of Alma v. AZCO Construction, Inc.*, the supreme court held that "a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law." 10 P.3d 1256, 1264 (Colo. 2000).  The supreme court, explaining the origins of the economic loss rule, noted that it "is intended to maintain the boundary between contract law and tort law." *Id.* at 1259.  The rule "serves to ensure predictability in

38

commercial transactions. The key to determining the availability of a contract or tort action lies in determining the source of the duty that forms the basis of the action." *Id.* at 1262. On this point, the supreme court was careful to note that the focus of an economic loss rule inquiry is not the type of damages suffered by the aggrieved party, cautioning that while this may be relevant, "the relationship between the type of damages suffered and the availability of a tort action is inexact at best." *Id.* at 1262-63.

¶ 82 In *BRW, Inc. v. Dufficy & Sons, Inc.*, the supreme court recognized that the economic loss rule can apply when the parties are bound by a single two-party contract but can also come into play when the parties "rely on a network of contracts to allocate their risks, duties, and remedies." 99 P.3d 66, 72 (Colo. 2004). The supreme court explained that this outcome was supported by three overarching policy considerations behind the economic loss rule:

> (1) to maintain a distinction between contract and tort law; (2) to enforce expectancy interests of the parties so that they can reliably allocate risks and costs during their bargaining; and (3) to encourage the parties to build the cost considerations into the contract because they will not be able to recover economic damages in tort.

39

*Id.*

¶ 83    In determining whether a duty in tort is independent of a contractual duty, the court should look to three factors: "(1) whether the relief sought in [tort] is the same as the contractual relief; (2) whether there is a recognized common law duty of care in [tort]; and (3) whether the [tort] duty differs in any way from the contractual duty." *Id.* (citing *Grynberg v. Agri Tech, Inc.*, 10 P.3d 1267, 1269 (Colo. 2000)).  This analysis becomes murky, however, when the question is whether the economic loss rule applies to intentional torts like fraud.

¶ 84    As relevant here, in *Van Rees v. Unleaded Software, Inc.*, the supreme court held that "pre-contractual misrepresentations are distinct from the contract itself, and may form the basis of an independent tort claim."  2016 CO 51, ¶ 3.  The supreme court explained that "[t]here is an important distinction between failure to perform the contract itself, and promises that induce a party to enter into a contract in the first place," and when "tort claims are based on misrepresentations made prior to the formation of the contract[]," these are not barred by the economic loss rule.  *Id.* at ¶¶ 13, 15.  The supreme court added that while the economic loss

40

rule helps ensure that tort law does not swallow contract law, "we also must be cautious of the corollary potential for contract law to swallow tort law." *Id.* at ¶ 19.

¶ 85    In *Bermel v. BlueRadios, Inc.*, the supreme court cautioned,

> To the extent the economic loss rule treats parties' assumption of contractual duties as disclaimers of their existing obligations in tort, it should be applied with some of the circumspection with which we have approached other exculpatory agreements. And just as we have held that "[u]nder no circumstances will an exculpatory agreement be permitted to shield against a claim of willful and wanton negligence," we note that the economic loss rule generally should not be available to shield intentional tortfeasors from liability for misconduct that happens also to breach a contractual obligation.

2019 CO 31, ¶ 20 n.6 (alteration in original) (citations omitted).  The supreme court also noted that it has only applied the economic loss rule to "to bar common law tort claims of negligence or negligent misrepresentation." *Id.* at ¶ 21.

¶ 86    Since *Bermel*, divisions of this court have split on the question of whether the economic loss rule bars intentional tort claims based on breaches of duties that may also arise under a contract. *Compare McWhinney Centerra Lifestyle Ctr. LLC v. Poag & McEwen*

41

*Lifestyle Centers-Centerra LLC*, 2021 COA 2, ¶¶ 73-75, 77, 80 (holding that intentional tort claims stemmed from tort law duties independent of the contract and the economic loss rule did not apply, adding "generally, the economic loss rule does not bar common law intentional tort claims"), *with Dream Finders Homes LLC v. Weyerhaeuser NR Co.*, 2021 COA 143, ¶¶ 63-67.

¶ 87    Veolia chiefly relies on *Dream Finders*; there, the division held that a series of interrelated documents between a lumber product distributor and homebuilder/contractor arranging for the sale of a product constituted a single agreement. *Id.* at ¶¶ 45-48. The division concluded that because the alleged misrepresentations (about lumber products off-gassing formaldehyde) were made after the contract was formed, *Van Rees*' carve-out for precontractual misrepresentations did not apply. *Id.* at ¶¶ 49-52. Finally, the division held that to the extent a party had a "duty to not make misrepresentations or engage in fraud after they entered into the contract, such duty was subsumed within the contract through the implied duty of good faith and fair dealing." *Id.* at ¶¶ 65-67.

¶ 88    The division noted that because the lumber supplier had "the discretion to modify the design and construction" of their products

without the buyer's consent, the "contract incorporated the implied duty of good faith and fair dealing." *Id.* at ¶ 67. Therefore, the supplier had "concurrent contractual and tort duties not to engage in fraud or to misrepresent the condition and safety" of its products, and the economic loss rule applied to its fraud and negligence claims. *Id.* at ¶¶ 65-74.

¶ 89    The *Dream Finders* division declined to conclude that the economic loss rule was inapplicable to intentional tort claims like fraud, noting that, despite the language in *McWhinney* and *Bermel*, "no Colorado case has held that the economic loss rule can never apply to claims for fraud or other intentional torts." *Id.* at ¶ 63. It also noted as distinguishing factors that the aggrieved parties in *Dream Finders* had "received the full benefit of their bargain documented in the contract" and also sought "to recover through their tort claims the very type of damages expressly excluded under the warranty they received" from the supplier, adding that "sophisticated commercial entities . . . may not circumvent the

exclusion of damages in their contracts by cloaking their claims in tort theories."[10]  *Id.* at ¶¶ 64, 80, 82.

¶ 90     The interplay of these cases presents us with two questions we must resolve.  First, are the contracts at issue here — namely, the Proposal, LNTPs, DBA, and CO-1 — an "interrelated network" of contracts to the point they become a single contract?  If so, then any misrepresentation Veolia made after the beginning of the parties' contractual relationship would not meet the black and white precontractual exception from *Van Rees*.  *See Van Rees*, ¶¶ 13, 15.  Second, looking to the duties involved in Antero's fraud and breach of contract claims, are the duties associated with fraud in the inducement independent of the contractual duties and, therefore, not barred by the economic loss rule?

---

[10] The special concurrence in *Dream Finders Homes LLC v. Weyerhaeuser NR Co.*, stressed that its holding should be interpreted narrowly and expressed concern that it could be misused to permit parties "to engage in fraudulent conduct during the course of a contractual relationship and then hide behind the economic loss rule to avoid economic damages caused by the fraud simply by arguing that fraudulent conduct necessarily breaches the duty of good faith and fair dealing implied in every contract."  2021 COA 143, ¶¶ 132-134 (Brown, J., specially concurring).

### 1. Interrelated Agreements

¶ 91 The first agreement between Veolia and Antero was the November 2014 Proposal. The Proposal provided that (1) Veolia agreed to test water samples to ensure its treatment methods would be viable for Antero; (2) Veolia would provide information on its methods and objectives to Antero; and (3) Veolia would provide Antero a report on the preliminary testing, all in exchange for $355,000. The Proposal also included an appendix of "terms and conditions" applicable to the contract and warranted, in part, that Veolia's "services will be free from defects in material and workmanship" for one year after Antero executed the contract.

¶ 92 While the Proposal included a liability limitation clause providing that neither Veolia nor Antero would be liable for any indirect damages ("any consequential, incidental, special, [or] punitive damages"), the limitation was made expressly inapplicable to "gross negligence, fraud, or willful misconduct by Veolia." And the liability limitation applied whether the liability was based in "contract, tort, strict liability, or any other theory."

¶ 93 The Proposal did not require Antero and Veolia to engage in any further business or contracts. While an implied duty of good

faith and fair dealing exists in every contract, *see, e.g., Hamon Contractors, Inc. v. Carter & Burgess, Inc.*, 229 P.3d 282, 292 (Colo. App. 2009), nothing in the Proposal created contractual duties mandating the eventual construction of (or payment for) Clearwater.

¶ 94     However, Veolia made several representations in the Proposal (subsequently incorporated into the DBA) that would later become important — including that Veolia's CoLD process could treat wastewater to produce "a stable, non-hazardous solid for disposal and/or re-use."  So, while the Proposal is not quite as extensive as the contracts in *Dream Finders*, representations made in the Proposal were relevant to the DBA and CO-1.  *See Dream Finders*, ¶¶ 45-52.

¶ 95     Therefore, we conclude that the Proposal, the LNTPs, and the DBA were part of an interrelated network of contracts — meaning that all of Veolia's misrepresentations were made after the contracts were executed.  To the extent the district court found that the economic loss rule did not bar Antero's fraud claims because they were made before the DBA was signed, we conclude this was error. But this conclusion does not mean that the economic loss rule bars Antero's fraud claims.

## 2. Does the Economic Loss Rule Apply?

¶ 96    We must now determine whether (1) the relief Antero sought via fraudulent concealment is the same as the relief it sought via its breach of contract claims; (2) there is a recognized common law duty of care to avoid fraudulently concealing or misrepresenting material facts; and (3) the duty in tort is independent of Veolia's contractual duties, including the implied duty of good faith and fair dealing. *See BRW*, 99 P.3d at 72.

¶ 97    To the first issue, Antero sought the same economic relief from its breach of contract and fraud claims: benefit-of-the-bargain damages and incremental out-of-pocket costs.[11] *See Dream Finders*, ¶ 54; *Top Rail Ranch Ests., LLC v. Walker*, 2014 COA 9, ¶ 33. Second, there is "a recognized common law duty in tort to refrain from deliberate concealment or misrepresentation of material facts." *Top Rail*, ¶ 36.

¶ 98    The remaining question is whether the common law tort duty to refrain from deliberate concealment or misrepresentation of material facts is independent of the implied duty of good faith and

---

[11] Antero's request for DLDs relief was purely contractual through its breach of contract claims and was not part of its fraud claims.

fair dealing and Veolia's express contractual obligations. We conclude that Veolia's duty to refrain from fraudulently concealing or misrepresenting material facts is independent of Veolia's contractual obligations, including the implied duty of good faith and fair dealing. *See McWhinney*, ¶ 77 ("[G]enerally, the economic loss rule does not bar common law intentional tort claims.").

¶ 99    "The covenant of good faith and fair dealing exists in every contract to enforce the reasonable expectations of the parties." *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 499 (Colo. 1995). The duty specifically applies "when one party has discretionary authority to determine certain terms of the contract, such as quantity, price, or time." *Id.* at 498. "A party breaches the implied duty of good faith and fair dealing by using the 'discretion conferred by the contract to act dishonestly or to act outside of accepted commercial practices to deprive the other party of the benefit of the contract.'" *Dream Finders*, ¶ 66 (citation omitted). "Discretion in performance occurs 'when the parties, at formation [of the contract], defer a decision regarding performance terms of the contract' leaving one party with the power to set or control the terms of performance after formation." *McDonald v. Zions First Nat'l Bank, N.A.*, 2015 COA 29,

48

¶ 67 (alteration in original) (quoting *City of Golden v. Parker*, 138 P.3d 285, 292 (Colo. 2006)).

¶ 100    Here, unlike the contracts in *Dream Finders*, Veolia had no discretion to modify Clearwater's core requirements under the DBA — such as its effluent quality requirements or process guarantees — without Antero's written consent. *See Dream Finders*, ¶¶ 67-69 (noting that contracts gave the company unrestricted discretion to modify products without the other party's knowledge or consent).

¶ 101    Veolia contends in its opening brief that "[t]he DBA does not require any particular design but instead specifies operational criteria that the facility must meet." And before the many pages of two-dimensional technical diagrams in the DBA's Appendix A, the DBA provides, "The constructed Facility may differ from what is depicted." We agree Veolia had some degree of discretion in *how* it designed Clearwater (though the limits of its discretion are evident from the fact that it had to seek a CO to split the fourth effect). This discretion, in turn, gave rise to an implied duty of good faith and fair dealing in Veolia's exercise of its discretion. But the challenged misrepresentations concerned the waste salt and power

consumption guarantees — Veolia had no discretion to change either. So, there is not such a direct overlap between Veolia's common law tort duty and its implied contractual duty as was the case in *Dream Finders*.

¶ 102 Moreover, unlike in *Dream Finders*, Antero's fraud claims were not asserted to "recover under a tort theory damages expressly excluded under the contract." *Id.* at ¶ 75. To the contrary, the DBA specifically contemplates increased damages in the case of fraud.

¶ 103 The DBA's overall damages limitation provides that "[i]n no event shall Veolia be liable, alone or in the aggregate, to Antero for any Losses in excess of an amount equal to sixty (60%) of the Contract Sum" — with one of the few exceptions being that the limitation does not apply to damages resulting from "either party's gross negligence, fraud or willful misconduct." To hold that the economic loss rule prohibits Antero's fraud claims because the implied duty of good faith encompasses them would render meaningless the explicit exception to the damages cap for damages resulting from fraud — despite the parties' clear intent to allow for greater damages in the event of fraud. Such an outcome would

bring to life the special concurrence's concern in *Dream Finders. Id.* at ¶ 133.

¶ 104    We therefore hold that the economic loss rule does not bar Antero's fraud claims because (1) the fraud concerned aspects of Veolia's performance over which Veolia had no discretion, thus undermining the implied duty of fair dealing's application; (2) Antero is not using tort claims to pursue damages explicitly prohibited by the DBA; and (3) the DBA explicitly permitted additional damages in the event of fraud — an intentional decision bargained for by two sophisticated commercial parties that would be greatly undermined if all fraud claims were barred. *See Dream Finders*, ¶¶ 67-69, 75.

¶ 105    We also note that this outcome better effectuates the supreme court's evolving guidance on application of the economic loss rule, as explained in *Bermel*, that "the economic loss rule generally should not be available to shield intentional tortfeasors from liability for misconduct that happens also to breach a contractual obligation." *Bermel*, ¶ 20 n.6; *see also McWhinney*, ¶ 77.

¶ 106    A rigid application of the economic loss rule to intentional torts like fraudulent concealment based on the implied duty of good

51

faith (which exists in all contracts) would effectively insulate a party to a contract from their own fraudulent actions and would effectively allow contract law to swallow valid tort law fraud claims. *See Bermel*, ¶ 20 n.6.

¶ 107    Thus, we conclude that, while the Proposal, LNTPs, and DBA formed an interrelated network of contracts, the economic loss rule does not bar Antero's fraud claims because the DBA excepted such claims, and Veolia's challenged common law duties are independent of its contractual ones. *See Bermel*, ¶ 20 n.6; *McWhinney*, ¶ 77; *see also Deutsche Bank Tr. Co. Ams. v. Samora*, 2013 COA 81, ¶ 38 ("An appellate court may affirm the trial court's ruling based on any grounds that are supported by the record.").

## B.    Remaining Fraud Contentions

¶ 108    Having determined that the economic loss rule does not bar Antero's fraud claims, we move to Veolia's arguments that it did not fraudulently induce Antero into entering into the DBA and CO-1 and that the district court need not have addressed fraud at all because the DBA's damages cap could not have been reached.

¶ 109    The district court found that Veolia fraudulently induced Antero to enter into the DBA by failing to disclose that it (1) could

52

not meet the DBA's power consumption guarantee under the original design and (2) was actively planning to redesign Clearwater to satisfy those concerns. Veolia argues that, as a matter of law, Antero could not have established that fraud occurred because Veolia disclosed the fourth effect split plan and Antero ratified the change. It also argues that the district court clearly erred by finding that Clearwater could not meet the power consumption guarantees without a redesign.

¶ 110    As for CO-1, the district court found that Veolia misrepresented the risks associated with splitting the fourth effect and misrepresented that the 4B effect would produce stable waste salt. Veolia argues that it disclosed the risks of the fourth effect split, Antero ratified the change, and Pietropaoli's September 1 email was too vague to constitute fraud.

### 1.    Applicable Law

¶ 111    A fraudulent concealment claim has five elements:

> (1) the concealment of a material existing fact that in equity and good conscience should be disclosed; (2) knowledge on the part of the party against whom the claim is asserted that such a fact is being concealed; (3) ignorance of that fact on the part of the one from whom the fact is concealed; (4) the intention that the

concealment be acted upon; and (5) action on the concealment resulting in damages.

*BP Am. Prod. Co. v. Patterson*, 263 P.3d 103, 109 (Colo. 2011) (citation omitted).

¶ 112 "A fact is material if a reasonable person under the circumstances would attach importance to it in determining his or her course of action," but "[a] party's reliance on a purported misrepresentation is not justified when the party is aware of or on inquiry notice of the falsity of the representation." *Rocky Mountain Expl., Inc. v. Davis Graham & Stubbs LLP*, 2018 CO 54, ¶ 53. Thus, a defrauded party may ratify a contract entered into via fraud, and waive any fraud claims, but only if the party "with full knowledge of the truth respecting the false representations, elected to continue to carry out the agreement." *Elk River Assocs. v. Huskin*, 691 P.2d 1148, 1153 (Colo. App. 1984). Whether a party ratified a contract entered into via fraud is a question of fact for the fact finder. *Id.*

2. Fraudulent Inducement and the DBA

¶ 113 For the power consumption guarantee, the district court highlighted that the guarantee was a "material term." This finding is supported by the record. The guarantee was the subject of

extensive negotiation and was a key part of the DBA. And the district court pointed to Veolia employee emails from August 14, 2015, indicating that Veolia's most recent power consumption figures showed that Clearwater's power needs could be higher than the guarantee ultimately included in the DBA.

¶ 114 Veolia contests this finding as clear error, but the evidence the district court highlighted enjoys record support. *See Romero*, 126 P.3d at 231; *Heights Healthcare*, ¶ 39. The district court also highlighted, with record support, that Veolia represented to Antero that it could meet the power consumption guarantee when it knew it could not without splitting the fourth effect and that Veolia knew of the associated risks the redesign entailed, yet allowed Antero to execute the DBA despite this knowledge.

¶ 115 For Clearwater's redesign, the district court stressed that Veolia employee emails indicated that Veolia concealed its plan to split the fourth effect, and the risks this plan posed, *until after* the DBA was signed in an effort to secure the DBA. The record supports this finding.

¶ 116 Veolia counters that it disclosed the plan to split the fourth effect because it included a "preliminary" reference to splitting the

fourth effect in the DBA's technical diagrams. In the DBA's initial design specifications for Clearwater, Veolia added two text boxes labeled with "4A" and "4B" on a diagram of the fourth effect, with another text box nearby with the words "PRELIMINARY – SPLITTING THE CRYSTALLIZER."

¶ 117 The district court found that the diagram was "ambiguous at best" and, thus, did not provide Antero with adequate notice of the plan to split the fourth effect or the implications of this change. We agree. *See Rocky Mountain*, ¶ 53; *Huskin*, 691 P.2d at 1153.

¶ 118 Even assuming the diagram put Antero on notice that Veolia might split the fourth effect, the diagram told Antero nothing about the potential risks for Clearwater's waste salt production or power consumption created by implementing the split-effect design. Nor does the diagram disclose that this design might be required for Clearwater to meet its power guarantees or that Veolia had been planning to implement it before the DBA was signed. The record supports the district court's finding that Veolia failed to disclose these crucial details to Antero.

### 3. Fraudulent Inducement and CO-1

¶ 119 Next, Veolia argues that the district court erred by finding that Veolia fraudulently induced Antero to enter into CO-1. The district court found that Veolia fraudulently induced Antero into executing CO-1 through representations in Pietropaoli's September 1 email regarding the quality of the 4B waste salt, while Veolia failed to disclose known risks about the waste salt's stability and that the waste salt might leave the centrifuge as a liquid. Veolia argues that Pietropaoli's email was too vague to constitute fraud. *See Rocky Mountain*, ¶ 48 ("Whether circumstances, conduct, or words are the means allegedly used to deceive, however, the means used must be of a 'definite and specific character' because a party has no right to rely on circumstances, conduct, or words that are equivocal . . . .") (citation omitted). But, as discussed, the email created definite and specific representations about the quality of the 4B waste salt, and the record supports the district court's finding that, when Veolia made these representations, it failed to disclose the known risks to the waste salt's quality created by splitting the fourth effect.

¶ 120 Veolia also argues that it disclosed the salt moisture risk to Antero when it provided the risk register before CO-1 was signed,

57

warning that "[m]aterial can turn to mush if exposed for too long." But this was, in essence, a less specific representation than the one made in Pietropaoli's email that the salt could become unstable if exposed to moisture for too long. It did not warn Antero that splitting the fourth effect could mean that the 4B salt would leave the centrifuge as an unstable liquid and would never be stable.

### 4. Ratification

¶ 121 Finally, Veolia argues that Antero ratified Veolia's fraud when it executed both the DBA and CO-1.

¶ 122 Veolia first argues that Antero ratified Veolia's concealment of the risks associated with splitting the fourth effect ahead of the DBA when Antero entered into CO-1, which disclosed the redesign. But to ratify a contract entered into via fraud the aggrieved party must decide to carry out the agreement "with full knowledge of the truth respecting the false representations." *Huskin*, 691 P.2d at 1153. Even if one could ratify a fraudulent contract with full knowledge of the fraud by later entering into another agreement resulting from continued fraud, Antero still did not have *full* knowledge of Veolia's misrepresentations when it entered into CO-1. Veolia revealed the plan to split the fourth effect by presenting it as

a "design optimization" that would reduce power costs — not as a design necessary to meet Veolia's power consumption guarantee that risked producing waste that could leave the 4B centrifuge as a liquid.

¶ 123   Veolia next argues that Antero ratified the fraud related to CO-1 by continuing to accept the 4B waste salt after a Veolia employee's email mentioned that the 4B waste salt would not be "granular" in March 2016 — notably, after CO-1 was signed in December 2015.  But ratification is a question of fact, *see id.*, and the district court explicitly noted that, while the email said that the "4B salt would not be granular," it did not provide notice that the "4B salt would be soupy or that it would need to be mixed with fly ash so that it would solidify."

¶ 124   Further, Antero's conduct following this email can hardly be described as an "acceptance" of 4B's soupy waste salt.  The noncompliant waste salt became a problem for the entire operation of Clearwater that was never resolved, and eventually led Antero to cancel the DBA.  That Antero hoped that the waste salt issue could be fixed does not mean that it agreed to carry out the DBA

regardless of Veolia's fraud. Indeed, Antero terminated the DBA when Veolia revealed that the salt issue would never be fixed.

¶ 125 The elements of fraud were met for both the DBA and CO-1. Veolia's plan to redesign Clearwater to split the fourth effect, the risks this posed for the 4B waste salt's stability, and Clearwater's inability to meet the power consumption guarantee without the redesign are material issues Veolia should have disclosed. *See Rocky Mountain*, ¶ 53; *see also Patterson*, 263 P.3d at 109. Further, Veolia knew of these issues while Antero did not, and the record supports the district court's findings that Veolia concealed this information to induce Antero to enter into the DBA and CO-1, which caused Antero damages. *See Patterson*, 263 P.3d at 109. The district court did not err.

### 5. The Damages Cap

¶ 126 Veolia argues that because it did not violate the DBA's waste salt requirements, the damages cap could not have been reached, and thus, the finding of fraud was immaterial. But we have affirmed the district court's finding that Veolia breached the DBA's waste salt requirements, so the cap would otherwise have applied — necessitating the district court's fraud analysis to award damages

in excess of that cap. Veolia also argues that the district court's benefit-of-the-bargain damages award should be reversed, and thus the cap would not be implicated. For the reasons explained below, we disagree.

## IX.  Damages

¶ 127    Antero asked the court to award it out-of-pocket costs totaling $451,003,827, but the district court declined to award damages for out-of-pocket costs, noting that such damages are not recognized by Colorado law. But Antero also offered the district court two alternative damages calculations if the court found Veolia liable for breach of contract or fraud, as shown in the table below:

| Damages Model | Fraud | Contract |
| --- | --- | --- |
| Benefit-of-the-Bargain Damages | $253,309,102 | $253,309,102 |
| Incremental Out-of-Pocket Costs | $88,567,845 | $88,657,845 |
| Delay Liquidated Damages | $0 | $28,269,765 |
| Subtotal (without fees and costs) | $341,966,947 | $370,936,713 |

¶ 128    As previously noted, after applying a discount rate to the benefit-of-the-bargain damages category and finding Veolia liable

61

for fraud and breach of contract, the court awarded Antero the following damages:

| Damages Category | Amount |
|---|---|
| Benefit-of-the-Bargain Damages | $144.1 million |
| Incremental Out-of-Pocket Costs | $72 million |
| Delay Liquidated Damages | $25.6 million |
| Subtotal | $241.7 million |

¶ 129   The district court later reduced Antero's damages by the $26.6 million balance due under the DBA, for a subtotal of $215.2 million (before pre- or post-judgment interest).  Having concluded that Veolia engaged in gross negligence, fraud, or willful misconduct, the district court had no reason to apply the DBA's damages cap.

¶ 130   According to Veolia, the district court erred (1) by basing its benefit-of-the-bargain award on a diminution of market value instead of the cost of repair; (2) because even if market value was the correct approach, the court only considered the potential income Clearwater could have produced and thus violated the DBA's consequential damages limitation; and (3) alternatively, by relying on "income from the business that Antero intended to

62

conduct from Clearwater, rather than the income generated from Clearwater itself."

### A. Standard of Review

¶ 131 We review the district's court's assessment of the amount of damages for clear error, but "[i]t is within the district court's discretion to determine the appropriate measure of damages." *Sos v. Roaring Fork Transp. Auth.*, 2017 COA 142, ¶¶ 35-36. We review de novo whether "the district court misapplied the law when determining the measure of damages." *Id.* at ¶ 37.

### B. Cost of Repair Versus Market Value

¶ 132 The parties first contest whether the district court's alleged error in choosing the market value damages measure was preserved and which party bore the burden of proof.

¶ 133 Antero argues that Veolia's cost-of-repair argument is a "back-door attempt to resurrect an affirmative defense that the [district] court rejected as waived for lack of timely pleading." Antero argues that Veolia raised its cost-of-repair argument in a motion to amend its answer to add an affirmative defense to limit damages under Colorado's Construction Defect Action Reform Act (CDARA) in June

2021.[12] §§ 13-20-801 to -808, C.R.S. 2024.  The district court denied the motion because (1) Veolia's request to amend its answer was untimely, not justified by good cause, and would cause undue delay; and (2) the court was unconvinced that the CDARA limit applied to the case, which concerned a commercial facility in West Virginia that was governed by the "extensively negotiated" DBA; thus, an amendment could have been "futile."

¶ 134    Antero contends that in *Hildebrand v. New Vista Homes II, LLC*, a division of this court held that claims to limit damages under CDARA were an affirmative defense, and the party asserting the affirmative defense bore the burden of proving the mitigating circumstances per C.R.C.P. 8.  *Hildebrand*, 252 P.3d 1159, 1171 (Colo. App. 2010).

¶ 135    Veolia counters that the default measure of damages in a defective construction case is cost of repair.  On this point, *Gold Rush Investments, Inc. v. G.E. Johnson Construction Co.* provides that "[d]amages for defective construction are to be measured by the

---

[12] The statute limits damages in civil claims against "construction professional[s]" (engineers, developers, architects, and builders, etc.) for construction defects to actual damages.  § 13-20-802.5(1), (4), C.R.S. 2024; § 13-20-806(1), C.R.S. 2024.

cost to place the defective structure in its intended condition, unless to do so would cause unreasonable economic waste." 807 P.2d 1169, 1174 (Colo. App. 1990). Therefore, because the cost of repair is the presumed measure of damages, Veolia argues that Antero bore the burden of proving that repairing Clearwater would constitute economic waste.

¶ 136 Veolia preserved this issue for appeal via its proposed findings of fact and conclusions of law. *See Cuevas v. Pub. Serv. Co. of Colo.*, 2023 COA 64M, ¶ 35 n.3 (*cert. granted* July 1, 2024). And we conclude that Veolia's argument does not concern mitigation that must be affirmatively pleaded. CDARA's damages cap acts as a specific means to limit a damages award, but Veolia argues that Antero failed to prove the applicable measure of damages — and "[a] plaintiff bears the burden of proof on both the fact and the amount of damages." *Buckley Powder Co. v. State*, 70 P.3d 547, 563 (Colo. App. 2002).

¶ 137 Ultimately, however, it is within the district court's discretion to determine which measure of damages is appropriate. *See Sos*, ¶ 36. The district court did not abuse its discretion in selecting market value as the appropriate measure of damages because

Antero provided sufficient evidence that repairing the facility would constitute economic waste. *See Streu v. City of Colorado Springs ex rel. Colo. Springs Utils.*, 239 P.3d 1264, 1268 (Colo. 2010) (The district court's decision "simply must not 'exceed[] the bounds of the rationally available choices.'" (quoting *Big Sky Network Can., Ltd. v. Sichuan Provincial Gov't*, 533 F.3d 1183, 1186 (10th Cir. 2008))) (alteration in original).

¶ 138    The district court highlighted that Veolia spent over $59 million in efforts to resolve the issues with Clearwater and ensure it could meet its contractual demands, without success.[13]  The district court also noted that Veolia told Antero that the waste salt issue would never be resolved.  And the court added that VNA and the external expert report Veolia commissioned recommended numerous design changes to address Clearwater's issues — but Veolia never implemented the changes.  Based on "Veolia's decision not to attempt these repairs," the district court concluded that "making these repairs was not economically feasible."[14]

---

[13] Veolia argues that this figure is even higher at $81 million.
[14] Alvyn Schopp, Antero's regional senior vice president, also testified that Antero believed "trying to repair the plant in its current condition would . . . not be economically viable."

¶ 139 Recall that without splitting the fourth effect, Veolia could not meet its power consumption guarantee, but splitting the fourth effect compromised the stability of the 4B waste salt. Veolia unsuccessfully spent millions of dollars and years of work attempting to resolve this problem. The record thus supports the district court's decision to use the market value measure of damages. *See Sos*, ¶ 36.

### C. The Income Approach to Calculate Market Value

¶ 140 Veolia next contends that the district court's benefit-of-the-bargain measure of damages approach to calculate market value erroneously considered only Clearwater's potential income (a prohibited form of "lost profits" damages).

¶ 141 The income approach is one of several methods available to calculate the fair market value of a property as a measure of damages, and it "values the property based on projections of the 'net income generated by the property during the remainder of its productive life.'" *Bd. of Cnty. Comm'rs v. DPG Farms, LLC*, 2017 COA 83, ¶¶ 25, 27 (quoting *Denver Urb. Renewal Auth. v. Berglund-Cherne Co.*, 568 P.2d 478, 480 (Colo. 1977)).

¶ 142 "An income approach uses potential income from the property, along with all other factors that would be considered by a buyer, as evidence of the fair market value of the property in its current condition." *Id.* at ¶ 39 (emphases omitted). But, importantly, "it is merely one factor to be considered by the jury in conjunction with all other material evidence of fair market value." *Id.*

¶ 143 The district court credited much of the testimony of Antero's damages expert, Becker, in determining the damages Antero suffered under a benefit-of-the-bargain approach. Becker testified that Antero suffered $253.3 million in damages. This was derived from the value of Clearwater if constructed in accordance with the DBA and CO-1 (but-for value) minus Clearwater's value as of September 2019 (actual value), when the DBA was terminated.

¶ 144 To calculate Clearwater's but-for value, Becker used the income valuation approach, what he also called a "discounted cash flow analysis," and evaluated Clearwater's value as a potential income producing asset. Becker estimated that Clearwater's but-for value, if completed in compliance with the DBA, was $258,409,102. In performing this calculation, Becker applied a six-time "terminal value" multiplier — a multiplier Becker used to calculate the

present value of Clearwater as an income-producing asset through 2028 — to Clearwater's estimated annual income and applied a 10% "discount rate" for the present value of future cash flow after accounting for the cost of capital. Becker then compared this but-for value to Clearwater's net actual value in September 2019 — $5.1 million based on Antero's internal accounting reports.

¶ 145 The court probed the residual $5.1 million net actual value at trial, and Becker testified that it was his understanding that this figure did not derive from an income approach, it was instead Antero's calculation of Clearwater as an "idle asset." The $5.1 million net value figure was Antero's internal assessment of Clearwater's actual value that accounted for the "marketable potential of the land, of the land the facility sits on, the salvage value of the parts of the facility minus whatever [Antero] thought were the costs that they would incur to" sell it. It was a calculation of actual value for a facility that had an "income of zero" and essentially represented its salvage value, though Becker noted that he had not conducted an independent salvage value analysis.

¶ 146 Subtracting the net actual value of Clearwater from its but-for value (derived using the income approach), Becker opined that Antero's damages were $253,309,102.

¶ 147 Veolia's rebuttal damages expert, Emmert, testified that he believed a higher discount rate would be more appropriate because there were greater risks to Clearwater's future cash flow that needed to be accounted for. The risks included that Antero had no prior experience managing a facility like Clearwater, Clearwater was specifically designed for only one purpose, Clearwater risked not receiving sufficient influent, and Clearwater was a "start-up" business.

¶ 148 Finding that these risks justified a higher discount rate than Becker used, the court applied a higher discount rate to Becker's but-for valuation of Clearwater. This brought the valuation of the property to $149,205,246, from which the court subtracted the net actual value of $5.1 million, resulting in the court's finding that Antero suffered $144,105,246 in benefit-of-the-bargain damages.

¶ 149 All of this is to say that the record shows that Becker's and the district court's benefit-of-the-bargain damage calculations did not rely exclusively on Clearwater's income to determine its fair market

value — it was but one factor considered. *See id.* at ¶ 25. Becker did not "simply compute[] prospective income from the property." *Id.* at ¶ 39. Instead, he used estimates of prospective income to determine the but-for fair market value of the facility as a potentially income-producing asset. And he compared this value to Clearwater's actual value according to Antero's internal estimations when looking at Clearwater as a salvage asset that could produce no income at all.

¶ 150  Furthermore, the district court's determination also accounted for other factors, albeit admittedly related to income, to *significantly* reduce the final damages award, including that Antero's income analysis did not properly account for the greater risks raised by Veolia. As a result, we conclude that the district court's benefit-of-the-bargain damages calculation did not rest solely on Clearwater's potential income and has record support. Therefore, its damages award must stand. *See Sos,* ¶¶ 36, 37.

¶ 151  This also means that we reject Veolia's contention that Becker's analysis constituted a "lost profits" form of consequential damages prohibited by the DBA. *See Lawry v. Palm,* 192 P.3d 550, 561 (Colo. App. 2008) ("Consequential damages may be awarded, in

some cases, for profits lost as a result of a breach of contract.").
Consequently, we need not address Antero's conditional cross-appeal on this point concerning whether the DBA's overall liability limitation exception for gross negligence, fraud, or willful misconduct applied to the DBA's prohibition on consequential damages.

### D. Income as a Facility and Not a Business

¶ 152    Next, Veolia contends that Becker mistakenly accounted for Antero's value as a business rather than solely Clearwater's value as a facility. Veolia relies chiefly on *Western Cities Broadcasting, Inc. v. Schueller*, which held that "in computing the value of real property, the value of the realty must be separated from the value of the business." 849 P.2d 44, 48 (Colo. 1993). There, the plaintiff presented evidence of the value a hypothetical radio station could have produced for a radio business on a leasehold property but failed to prove the actual value of the leasehold itself and failed to prove that the radio business's value "had any bearing on the value of the leasehold." *Id.* at 48-49.

¶ 153    That is not the case here. Clearwater is an existing asset, and Becker's analysis relied on concrete data about Clearwater's

expected operations. And the different valuations presented by Antero's and Veolia's respective damages experts considered the impact Antero's management might have had on Clearwater's value through the discount rate calculation. Becker also explicitly testified that his calculations considered only Clearwater's value as a facility and excluded the value of any of Antero's other revenue streams.

¶ 154 Because the district court did not erroneously conflate Antero's value as a business with Clearwater's value as a facility, its damages award stands. *See Sos*, ¶¶ 36, 37.

## X. Appellate Attorney Fees

¶ 155 As a final matter, both parties request appellate attorney fees and costs under C.A.R. 39 and 39.1. The DBA provides that the "prevailing party" as determined by the court "shall be reimbursed by the other Party for all costs, expenses and charges, including, without limitation, reasonable attorneys' fees." When a contract contains a fee-shifting provision and the prevailing party requests appellate attorney fees and explains the legal and factual basis for the award, we may award appellate attorney fees. *See Saturn Sys., Inc. v. Militare*, 252 P.3d 516, 530 (Colo. App. 2011).

¶ 156    C.A.R. 39(a)(2) details that "if a judgment is affirmed, costs are taxed against the appellant." We have affirmed the district court's judgment on every claim Veolia raised; thus, costs must be taxed against Veolia. And because we conclude that Antero is the prevailing party on appeal, under the DBA and in accordance with C.A.R. 39.1, we award Antero its reasonable appellate attorney fees and costs incurred in this appeal. We exercise our discretion under C.A.R. 39.1 to remand the case to the district court to determine Antero's reasonable appellate attorney fees and costs in addition to its damages award and attorney fees incurred at trial.

## XI.    Disposition

¶ 157    We affirm the district court's judgment and remand the case to the district court to calculate Antero's reasonable appellate attorney fees and costs. And because we affirm the district court's judgment, we also decline Veolia's request to reverse the district court's award of attorney fees and costs.

JUDGE JOHNSON and JUDGE SCHOCK concur.