24CA1136 Marriage of Kowalik 07-24-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 24CA1136
Arapahoe County District Court No. 21DR800
Honorable Michelle Jones, Judge

In re the Marriage of

Anne Patricia Kowalik,

Appellee,

and

Thaddeus Stefan Kowalik,

Appellant.

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE FOX
Harris and Schutz, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced July 24, 2025

Allen Vellone Wolf Helfrich & Factor P.C., James S. Helfrich, Denver, Colorado;
Meyers Family Law, Thomas A. Meyers, III, Littleton, Colorado, for Appellee

Anne Whalen Gill, LLC, Anne Whalen Gill, Castle Rock, Colorado, for Appellant

¶ 1    In this post-dissolution of marriage case involving Thaddeus Stefan Kowalik (husband) and Anne Patricia Kowalik (wife), husband appeals the district court's order adopting a magistrate's decision holding husband liable for a loss of funds resulting from a fraudulent wire transfer.  We affirm.

## I.    Relevant Facts

### A.    Dissolution Proceedings

¶ 2    After twenty-six years of marriage, wife petitioned for dissolution in 2021.  The parties executed a separation agreement in which husband agreed to pay wife roughly $375,000, as follows: (1) $120,000 due within fourteen days of entry of the dissolution decree, and (2) $255,000 representing her share of the proceeds from the sale of the marital home (with no set due date).  The agreement indicated that husband's attorney, Randy Corporon, held those funds in his Colorado Lawyer Trust Account Foundation (COLTAF) account.  The agreement also required each party to indemnify the other for any assigned debts or obligations, including costs, interest, penalties, and attorney fees incurred to enforce the agreement.

¶ 3     The parties filed an affidavit asking that the district court enter the dissolution decree without their appearance at a hearing.

¶ 4     On May 19, 2022, the district court issued the decree and incorporated the separation agreement.

### B.     Fraudulent Wire Transfer

¶ 5     The parties stipulated to the following facts.

¶ 6     On May 17, 2022, an unknown hacker gained unauthorized access to wife's attorney's email account.  The attorney did not see emails exchanged between the hacker and others.

¶ 7     On May 19, after the dissolution decree entered, the hacker (posing as wife's attorney) emailed Corporon, indicating that wife could not accept a $375,000 physical check and requested that he wire the funds to an "escrow bank account."  Less than an hour later, the hacker sent another email, asking that the funds instead be wired to a "trading account" in Hong Kong because wife was "travelling out for some business."

¶ 8     That same day, the hacker (posing as wife) emailed Corporon and attached wire instructions, which named, as the sole recipient, "Sonicmaster Corporation Limited," with a "principal address at a Hong Kong shopping arcade."  The signature block included wife's

name followed by the title, "Instructor Fair Trade Partner," and the email address that the hacker used differed from the one wife had previously disclosed to Corporon.

¶ 9     The hacker's emails contained grammatical and spelling errors and used "unique" phrasing. The emails deviated from wife's attorney's earlier communications with Corporon and were "inconsistent with [wife's] position as an English teacher and her prior correspondence with [husband]."

¶ 10    On the morning of May 20, Corporon called husband to discuss the wire transfer. Husband "expressed surprise," stating that it made "no sense" that wife was on her way to Hong Kong or had an investment account there. Husband then told Corporon to verify the legitimacy of the wire instructions. Corporon represented that he "had made or would make a call to [wife's attorney]." Relying on Corporon to confirm the transfer, husband took no further action.

¶ 11    Later that day, the bank questioned if the wire transfer should be sent in U.S. dollars. Corporon left voicemails for wife and her attorney. (Corporon used a phone number for wife provided by the hacker.) The hacker (posing as wife) returned his call, spoke with a

foreign accent, and said that the transfer should be in U.S. dollars. Corporon had never spoken to or met wife at any point. Deducting certain fees, Corporon wired $374,290 to the Hong Kong account.

¶ 12 Almost immediately, Corporon "forwarded the two email strings containing his correspondence with the hacker" to husband. Husband texted back that the transfer to Hong Kong was understandable, rationalizing that wife had a friend involved in Southeast Asian trading, who likely helped her open the account. According to Corporon, his text put his "mind at ease."

¶ 13 On May 21, husband texted the parties' adult daughter, stating that wife was out of the country. The daughter quickly responded that wife was, in fact, in Denver.

¶ 14 On May 23, three days after the wire transfer, husband informed Corporon that wife was in Denver. When Corporon asked whether she had a foreign accent, husband replied no. Corporon then realized the transfer was fraudulent. Despite Corporon's efforts, the funds could not be recovered.

¶ 15 Without admitting liability, wife's attorney's malpractice carrier paid about $94,900 to settle wife's claim, reflecting the policy limits minus defense costs.

4

## C. Motion to Enforce

¶ 16    Wife moved to enforce the separation agreement against husband, arguing that he was liable for Corporon's actions under an agency theory. *See* § 14-10-112(5), C.R.S. 2024 (a party cannot sue in contract for breach of a separation agreement but can only seek enforcement); *see also Scott v. Scott*, 2018 COA 25, ¶ 56 n.7; *In re Marriage of Collins*, 2023 COA 116M, ¶ 64.

¶ 17    On October 13, 2023, after an evidentiary hearing, a magistrate granted the motion, reasoning that

> [Corporon] was [husband's] agent when he caused the funds . . . to be transferred to Hong Kong. [Corporon] did not withdraw from representation until January 18, 2023. [Husband] and [Corporon] communicated about the transfer before and after [Corporon] initiated [it], demonstrating that it was a subject of the agency. [Corporon] was not acting as [wife's] agent when he caused the funds at issue to be transferred to Hong Kong.
>
> [Corporon] acted within the scope of his agency when he caused the funds . . . to be transferred to Hong Kong. The funds held by [him] related to his representation of [husband]. [Husband] delegated investigation of his suspicions and decision making relating to the funds to [Corporon]. [Husband] never directly instructed [Corporon] not to make the transfer. [Corporon] acted within the scope of his authority both because it was part of [his]

5

> customary duties and because [husband] was knowledgeable about the requested transfer and delegated the decision making to him. [Corporon] thought he was transferring the funds to [wife], which is different from acting outside the scope of his authority.

The magistrate entered judgment in favor of wife and against husband in the amount of $280,211 plus interest at eight percent annually, accruing from May 20, 2022, the date of the fraudulent wire transfer (and one day after the court's decree approving the separation agreement). The district court adopted the magistrate's decision.

¶ 18    Husband now appeals.

## II.    Appellate Standard of Review

¶ 19    Our review of a district court's order adopting a magistrate's decision is effectively a second layer of appellate review, and we must accept a magistrate's factual findings unless they are clearly erroneous. *In re Marriage of Thorburn*, 2022 COA 80, ¶ 25; *see* C.R.M. 7(a)(9). A court's factual findings are clearly erroneous only if there is no record support for them. *Thorburn*, ¶ 25. Legal conclusions, however, are reviewed de novo. *See In re Parental Responsibilities Concerning S.Z.S.*, 2022 COA 105, ¶ 11.

6

## III. Discussion

### A. Scope of the Agency

¶ 20    Husband challenges the magistrate's finding that Corporon acted within the scope of his agency when he wired the funds to the hacker. We disagree.

¶ 21    The existence of an agency relationship is generally a question of fact, but it may be determined as a matter of law when the underlying facts are undisputed. *Fresquez v. Trinidad Inn, Inc.*, 2022 COA 96, ¶ 14.

¶ 22    An agency relationship exists when one person, the "principal," authorizes another, the "agent," to "act on the principal's behalf and subject to the principal's control." Restatement (Third) of Agency § 1.01 (Am. L. Inst. 2006); *see Villalpando v. Denver Health & Hosp. Auth.*, 181 P.3d 357, 362 (Colo. App. 2007) (An agency relationship "results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.") (citation omitted).

¶ 23    Attorneys are agents of their clients when acting within the scope of their representation. *See Comm'r v. Banks*, 543 U.S. 426,

7

436 (2005) ("The attorney is an agent who is dutybound to act only in the interests of the principal," his client.); *see also Siener v. Zeff*, 194 P.3d 467, 471 (Colo. App. 2008); Colo. RPC 1.2.

¶ 24    As pertinent here, a principal is liable for the acts of an agent performed within the scope of the agent's actual authority, regardless of whether the principal knows of the agent's conduct. *Craig Hosp. v. Blue Cross Blue Shield of Kan.*, 2024 COA 74, ¶ 27.

¶ 25    An agent has actual authority when the agent reasonably believes, based on the principal's manifestations, that the principal authorizes the agent to act in a certain way.  Restatement (Third) Of Agency § 2.01; *Craig Hosp.*, ¶ 27.  This authority may be either express or implied.  *Fresquez*, ¶ 21.

¶ 26    Express authority arises from specific directions from the principal.  *See State Farm Mut. Auto. Ins. Co. v. Johnson*, 2017 CO 68, ¶ 21.

¶ 27    Implied authority, on the other hand, includes actions that are "incidental to, or are necessary, usual, and proper to accomplish or perform, the main authority expressly delegated to the agent." *Fresquez*, ¶ 21 (citation omitted).

¶ 28     Ultimately, "[t]he focal point for determining whether an agent acted with actual authority is the agent's reasonable understanding at the time the agent takes action." *Id.* at ¶ 19 (citation omitted).

¶ 29     Here, there is no dispute that Corporon was husband's attorney and therefore his agent. *See Banks*, 543 U.S. at 436. Corporon was tasked with ensuring that husband complied with his financial responsibility to wife under the separation agreement and was holding her funds in his COLTAF account for that purpose. A wire transfer was a common act incidental to fulfilling that obligation. *See Fresquez*, ¶ 21. As a result, Corporon's conduct fell within the scope of his implied actual authority. *See id.*

¶ 30     Although husband expressed some concern about the Hong Kong destination and wife's purported investment account there, he did not revoke Corporon's authority or tell him not to proceed with the transfer. Instead, husband deferred to Corporon, directing him to verify the wiring instructions. Husband's conduct supports the determination that Corporon reasonably understood he had authorization to proceed upon verification. And husband never followed up with Corporon before the transfer occurred.

9

¶ 31    Husband's subsequent text to Corporon, stating that the wire transfer seemed reasonable, reinforces the inference that Corporon acted within the scope of his authority.

¶ 32    That Corporon was deceived does not change the outcome. Acts of an agent within the scope of their authority are binding on the principal, even if negligently or erroneously performed. *See City of Aurora v. Colo. State Eng'r*, 105 P.3d 595, 622 (Colo. 2005); *see also Craig Hosp.*, ¶ 27; *Settle v. Basinger*, 2013 COA 18, ¶ 32 ("Under the master-servant doctrine, an employer or principal may be liable for the negligence of an employee or agent who acted within the scope of his or her employment or agency." The doctrine applies when the employer or principal has "the power and right to control the employee's or agent's actions within the scope of the employment or agency."). And as between an innocent third party and a principal, the principal bears the risk of the agent's misjudgment because the principal had the power to select, instruct, and supervise the agent. *City of Aurora*, 105 P.3d at 622.

¶ 33    In all, the magistrate correctly determined that Corporon acted within the scope of his agency and that husband was liable for the consequences of Corporon's actions. *See Craig Hosp.*, ¶ 27.

10

¶ 34 Still, husband asserts that the magistrate improperly relied on a stipulation that husband expressly approved the wire transfer. Even assuming that the magistrate erred in this regard, the remaining stipulated facts, discussed above, adequately support the magistrate's determination that Corporon acted within the scope of his implied actual authority. Thus, any reliance on a misunderstanding concerning husband's express approval was harmless. *See* C.A.R. 35(c).

## B. Intervening Causation

¶ 35 Husband also contends that the hacker's theft constituted an unforeseeable intervening cause that broke the chain of causation and thereby released him from any legal responsibility to wife. Wife counters that the concept of intervening causation is a tort principle and does not apply in this enforcement dispute. We agree with wife.

¶ 36 Husband relies solely on *Veolia Water Technologies, Inc. v. Antero Treatment LLC*, 2024 COA 126, to argue that intervening causation is applicable because neither he nor Corporon owed wife a contractual duty, and any obligation arose under common law. That reliance is misplaced. In *Veolia,* a project owner sued its

11

contractor for breach of contract and fraudulent concealment after the contractor allegedly failed to deliver a functioning wastewater treatment facility. *Id.* at ¶¶ 1, 31, 34. The division concluded that the contractor's duty not to conceal material risks was independent of its contractual obligations, and therefore the economic loss rule did not bar the fraud claim. *Id.* at ¶¶ 79, 98.

¶ 37    *Veolia* does not support the application of intervening causation to contractual enforcement actions. It did not involve agency relationships, third-party fraud, or excusal of liability due to intervening acts. Instead, the case focused on whether a fraud claim could coexist with a breach of contract claim. *Id.* at ¶ 107. Nothing in *Veolia* addressed whether a principal can avoid responsibility for an agent's conduct based on the actions of a third party.

¶ 38    Accordingly, because the concept of intervening causation does not apply here, we decline to consider husband's contention.

### C.    Ratification

¶ 39    Husband devotes one sentence to his next contention: "Even if Corporon had been acting as [his] agent, [he] never ratified Corporon's actions." The argument lacks sufficient development

12

and is not supported by legal analysis. He references a single case citation, "*Siener, supra,*" without elaborating on its relevance to the facts of this case. And the only other instance in which he cites *Siener* is to support the general principle that an attorney-client relationship is one of principal and agent. We decline to address this undeveloped argument. *See In re Marriage of Zander*, 2019 COA 149, ¶ 27 (appellate court will not consider an argument not supported by any meaningful legal analysis), *aff'd*, 2021 CO 12; *see also Antolovich v. Brown Grp. Retail, Inc.*, 183 P.3d 582, 604 (Colo. App. 2007) (declining to review appellants' arguments under C.R.C.P. 59 and 60 because they reflected a "shotgun approach" and set forth "little analysis"). To the extent that he expands on his argument in his reply brief, we do not address those new arguments either. *See In re Marriage of Dean*, 2017 COA 51, ¶ 31.

## D.   Colo. RPC 1.15A(a)

¶ 40    Husband next contends that he should not be liable for the lost funds because Corporon was not acting as his agent, but rather as a fiduciary to both parties by holding the funds in his COLTAF account and that he "complied" with that duty by "disbursing" the funds. In support, he cites Colo. RPC 1.15A(a) cmt. 8, which

provides that "[a] lawyer should hold property of others with the care required of a professional fiduciary."

¶ 41    A party appealing a magistrate's decision must first raise a particular issue in the district court in a petition for review and allow thereby allow the district court to correct any error before raising the issue on appeal. *See People in Interest of K.L-P.*, 148 P.3d 402, 403 (Colo. App. 2006).

¶ 42    Husband did not raise this specific contention in his petition for review. At most, he maintained that the magistrate erred by failing to recognize Corporon as wife's agent when she placed her share of the funds into Corporon's "possession and control" and that any mistake should be blamed on her. But now he is contending that he should not be held responsible because Corporon was not serving as his agent but as a fiduciary to both parties and that he properly carried out that role (even though the funds went to the wrong person). That is a different issue. Moreover, his petition for review of the magistrate's decision made no mention of Colo. RPC 1.15A(a).

¶ 43    Because the contention is not preserved, we decline to address it. *See K.L-P.*, 148 P.3d at 403.

## E. Prejudgment Interest

¶ 44   Finally, husband contends that the magistrate erred by awarding prejudgment interest. We are not persuaded.

¶ 45   Under section 5-12-102(1), C.R.S. 2024, prejudgment interest begins accruing from the time the money is wrongfully withheld. *See Collins*, ¶¶ 65, 70. "The statute recognizes the time value of money and is broadly construed to effectuate its purpose of compensating a party for the deprivation of the ability to use property when the party is entitled to have received it." *Id.* at ¶ 65.

¶ 46   The magistrate awarded prejudgment interest at an annual rate of eight percent, accruing from May 20, 2022. The magistrate found, and the record supports, that Corporon wired the funds that day — including the martial home proceeds, which had no set deadline — and that wife never received them. Thus, the magistrate appropriately awarded prejudgment interest from that date. *Id.* at ¶ 72 (in the absence of a date certain for a transfer, the district court may rely on the date of wrongful withholding, and under section 5-12-102(1), the period of wrongful withholding is measured from the time the injury occurs, namely, when the party, under the

circumstances, had a reasonable expectation of receiving the property but did not).

¶ 47     As to the $120,000 that husband was required to pay wife within fourteen days of entry of the dissolution decree, he asserts that prejudgment interest should not have accrued until June 2, 2022.  Even assuming that is correct, he does not explain how thirteen days' worth of interest creates more than a de minimis impact on him or how his substantial rights were prejudiced.  Absent this necessary showing of prejudice, he has not established a basis to reverse.  *See People in Interest of A.C.*, 170 P.3d 844, 845 (Colo. App. 2007) (concluding that an alleged error, without a valid allegation of prejudice, is not grounds for reversal); *see also* C.A.R. 35(c).

## IV.   Disposition

¶ 48     The judgment is affirmed.

JUDGE HARRIS and JUDGE SCHUTZ concur.