1
 2026 CO 52 Veolia Water Technologies, Inc., Petitioner v. Antero Treatment LLC, Antero Resources Corporation, Antero Midstream Partners LP, and Antero Midstream Corporation. No. 25SC21Supreme Court of Colorado, En BancJune 23, 2026

 Certiorari to the Colorado Court of Appeals Court of Appeals
Case No. 23CA897 Judgment Affirmed en banc

 Attorneys for Petitioner: Fox Rothschild LLP Marsha M.
 Piccone Risa B. Brown Denver, Colorado Mayer Brown LLP Nicole
 A. Saharsky Minh Nguyen-Dang Washington, District of Columbia
 Troutman Pepper Locke LLP Misha Tseytlin Chicago, Illinois

 Troutman
 Pepper Locke LLP Ralph A. Finizio Robert A. Gallagher
 Pittsburgh, Pennsylvania

 Attorneys for Respondents: Marie R. Yeates Houston, Texas
 Vinson & Elkins, LLP James D. Thompson, III Stephanie L.
 Noble Matthew C. Hoffman Garrett T. Meisman Houston, Texas
 Vinson & Elkins, LLP Michael A. Heidler Austin, Texas
 Womble Bond Dickinson (US) LLP Kendra N. Beckwith Kenneth F.
 Rossman, IV Denver, Colorado Davis Graham &Stubbs LLP
James R. Henderson Denver, Colorado

 Attorneys for Amicus Curiae Colorado Defense Lawyers
 Association: Montgomery | Amatuzio Christopher R. Reeves
 Denver, Colorado Attorneys for Amicus Curiae Gregory Klass:
 Berg Hill Greenleaf Ruscitti LLP Geoffrey C. Klingsporn
 Boulder, Colorado

 JUSTICE GABRIEL delivered the Opinion of the Court, in which
 CHIEF JUSTICE MARQUEZ, JUSTICE BOATRIGHT, JUSTICE HOOD,
 JUSTICE SAMOUR, JUSTICE BERKENKOTTER, and JUSTICE BLANCO
 joined.

 OPINION

 GABRIEL, JUSTICE.

 ¶1
 This dispute arises from a series of agreements between and
 among Antero Treatment LLC, Antero Midstream Partners LP,
 Antero Midstream Corporation, and Antero Resources
 Corporation (collectively "Antero"), on the one
 hand, and Veolia Water Technologies, Inc.
("Veolia"), on the other, that led to the design
 and construction of a facility to treat wastewater from
 hydraulic fracturing ("fracking") operations.
Antero asserts claims against Veolia for, among other things,
 breach of contract and fraud. We granted certiorari to
 consider whether the economic loss rule bars Antero's
 fraud claim when, according to Veolia, the parties were in a
 contractual relationship, the fraud claim sought the same
 relief as Antero's contract claim, and the fraud
 concerned Veolia's performance under the contract.
¶2 We now conclude that because (1) the interrelated
 contracts doctrine does not apply to a series of contracts
 between two parties when each contract represents a
 stand-alone transaction and (2) the fraud alleged here
 occurred prior to the formation of the pertinent contract
 and, on the facts presented, induced Antero to sign that
 contract, the economic loss rule does not bar Antero's
 fraud claim in this case.

 ¶3
We therefore affirm the court of appeals division's
 decision below, albeit on other grounds, and we remand this
 case with instructions to return the case to the trial court
 for a determination of the reasonable attorney fees to be
 awarded to

 Antero as the prevailing party under the pertinent
 contract's fee-shifting provision.

 I.
Facts and Procedural History

 ¶4
 Antero Treatment is an indirect, wholly owned subsidiary of
 Antero Midstream Corporation, a company that owns, operates,
 and develops midstream energy assets for Antero Resources, a
 natural resources company engaged in oil and gas extraction
 and production. In the summer of 2014, Antero began
 investigating alternative disposal options for wastewater
 produced from its fracking operations, which it had
 previously discarded by trucking the wastewater to disposal
 wells, a method that was economically and environmentally
 problematic. Antero approached Veolia, a company that designs
 and constructs water treatment facilities, to discuss options
 for the disposal of Antero's wastewater. Veolia
 subsequently presented Antero with a proposal to build a
 facility that would use Veolia's technology to separate
 and crystallize the solids within the wastewater, creating a
 waste salt that could be landfilled and leaving behind water
 that was clean enough to reuse or discharge into surface
 waterways.

 ¶5
 Antero and Veolia initially agreed on a "Bench Scale
 Proposal" under which Veolia would conduct a study and
 preliminary engineering for such a wastewater treatment
 facility. Antero paid Veolia $355,000 to conduct this Bench
 Scale Study, which culminated in Veolia's issuing two
 "Bench Scale Reports." Throughout this

 study period, Veolia represented to Antero that the
 facility's waste salt would be solid and stable, with
 "zero liquid waste," such that the salt would be
 suitable for landfill disposal. In light of these
 representations, and at Veolia's suggestion, Antero
 retained a consultant to design and complete a landfill
 permit application. This application was based on the
 information and samples that Veolia had provided regarding
 the waste salt's physical characteristics.

 ¶6
 After the Bench Scale Proposal work, Antero provided Veolia
 with two "Limited Notice to Proceed" agreements
 ("LNTPs"), under which Antero agreed to pay Veolia
 $1.5 million to conduct additional design work. Following
 these exploratory agreements, and throughout the summer of
 2015, Antero and Veolia negotiated the terms of what would
 become the parties' Design/Build Agreement
 ("DBA"), under which Veolia would design and build
 a turnkey water treatment facility called
 "Clearwater" for Antero.

 ¶7
 As initially envisioned, the Clearwater facility would treat
 Antero's wastewater in three stages. First, a
 pretreatment stage would use chemicals to remove solids and
 dissolved metals from the water. Second, a thermal stage
 would crystallize and separate salt from the chemically
 treated water. This stage would use four sequential chambers,
 or "effects," in which wastewater would be heated
 and crystallized waste salt would be separated. This stage
 would also use "chillers," which would consume
 significant power, for cooling purposes. Finally,

 a post-treatment stage would remove any remaining volatile
 organic compounds to produce water capable of reuse in oil
 and gas operations or discharge into freshwater streams. This
 process would satisfy Antero's objective of producing
 waste salt that could be landfilled.

 ¶8
 In addition, because the cost of power would be passed
 through to Antero, Antero made clear to Veolia that any
 agreement would need to satisfy certain specified power
 consumption limits.

 ¶9
 As the parties were negotiating the DBA, Veolia became
 concerned about the potential power consumption required for
 the chillers used in Clearwater's crystallization
 process. Veolia specifically became concerned about its
 ability to satisfy Antero's power consumption
 requirements. Because of these concerns, and without
 notifying Antero, Veolia began to redesign Clearwater to
 split the fourth effect in the second stage of treatment from
 one chamber to two, to reduce the need for the
 power-demanding chillers.

 ¶10
 Thereafter, and before the parties entered into the DBA,
 Veolia further discovered that it had underestimated the
 chillers' daily power requirements by a significant
 margin, exacerbating its power consumption concerns. Despite
 determining that the facility's power consumption would
 likely exceed Antero's specified maximum consumption
 requirements, Veolia did not share its calculations with
 Antero. Instead, it moved forward with the DBA negotiations,

 knowing full well that its most recent calculations exceeded
 Antero's requirements.

 ¶11
 Four days after Veolia discovered this significant but
 undisclosed miscalculation, the parties signed the DBA, with
 Antero ultimately agreeing to pay Veolia $255,765,253 once
 the facility was completed.

 ¶12
 The DBA contained a number of requirements and provisions
 that are pertinent to this case.

 ¶13
 First, the DBA included two key operating requirements for
 the Clearwater facility: (1) the DBA's waste salt and
 sludge specifications required "Free Liquids—Pass,
 No free liquids" and "Total Solids—no limit,
 must pass paint filter test," reflecting Antero's
 requirement that the waste salt be suitable for landfilling;
 and (2) the facility's power consumption could not exceed
 505,500 kilowatt-hour ("kWh") per day with its
 chillers on or 340,000 kWh per day with the chillers off.

 ¶14
 Second, the DBA had an integration clause, which specifically
 incorporated the prior Bench Scale Proposal and LNTPs into
 the DBA. This integration clause provided, in pertinent part,
 "This Agreement together with each LNTP, the Benchscale
 Study (excluding the confidentiality provisions contained
 therein) and the Existing Confidentiality Agreements, sets
 forth the entire agreement between the Parties with regard to
 the subject matter of this Agreement ...."

 ¶15
 Finally, the DBA included a damages cap clause that limited
 Veolia's liability to sixty percent of the contract sum
 for most claims but explicitly provided that this limitation
 did not apply in the case of, among other things, either
 party's "gross negligence, fraud or willful
 misconduct." (Emphasis added.)

 ¶16
 After the parties signed the DBA, Veolia's senior
 management began developing a "plan" to
 "sell" its proposed design change (i.e., splitting
 the fourth effect into two separate chambers) as "a
 WIN/WIN Scenario and benefit for the project." In the
 course of its internal conversations, however, Veolia had
 identified a significant risk that splitting the fourth
 effect might compromise the waste salt's quality and
 render the waste salt too unstable for Antero's landfill
 plans. Veolia did not disclose this risk to Antero.

 ¶17
 Then, just eight days after the DBA was signed, Veolia
 proposed to Antero Change Order 1 to modify the original
 design of Clearwater by splitting the fourth effect.
Consistent with its plan to sell this design change as a win,
 Veolia presented it to Antero as "design
 optimizations" and listed the proposed change's
 alleged benefits. Again, however, Veolia never communicated
 the potential risk that this design change posed to the waste
 salt's quality. To the contrary, Veolia repeatedly
 assured Antero that the salt quality would be of suitable
 stability for Antero's envisioned landfill strategy.
Ultimately, having not been advised of (or having

 been misled as to) the material facts, Antero agreed to
 Change Order 1, and Veolia began constructing Clearwater.

 ¶18
 Two years after the DBA was signed, Clearwater began treating
 wastewater and producing waste salt. Consistent with the
 risks that Veolia had identified internally (but did not
 disclose to Antero) before Change Order 1 was signed,
 Clearwater produced a "soupy salt" as a result of
 the splitting of the fourth effect. This salt quality caused
 a number of problems for Antero. Among other things, the salt
 leaked out of transport trucks and storage buildings. In
 addition, the "soupy salt" could not be landfilled
 using the standard landfilling techniques and equipment that
 Antero had envisioned. Rather, the salt could be landfilled
 only after difficult and expensive solidification efforts
 that had never been part of Antero's landfill strategy.

 ¶19
 As a result of the issues arising from the waste salt's
 quality, as well as from other mechanical, design, and
 process-based failures that arose at the facility, Clearwater
 never satisfied a number of the critical terms of the DBA.
Subsequently, Veolia informed Antero that the salt quality
 would not improve and that it was Antero's problem.
Antero terminated the DBA the next day and eventually
 "mothballed" Clearwater.

 ¶20
 Antero and Veolia thereafter filed suit against one another,
 and the cases were consolidated. As pertinent here, Antero
 brought claims against Veolia for both breach of contract
 under the DBA and for fraud.

 ¶21
The case proceeded to a bench trial, after which the trial
 court found that, prior to the execution of the DBA, Veolia
 knew that Clearwater would not meet Antero's required
 power consumption guarantee, had fraudulently concealed that
 fact from and intentionally failed to disclose that fact to
 Antero, and had failed to disclose to Antero its plan to
 split the fourth effect, all to induce Antero to execute the
 DBA. The court further determined that the economic loss rule
 did not bar Antero's claim for this fraudulent
 inducement. In its analysis, the court noted that Colorado
 case law excepts from the economic loss rule "a
 defendant's pre-contractual conduct because, at that
 time, there was no contract that could have subsumed
 identical tort duties."

 ¶22
 In reaching this conclusion, the trial court rejected
 Veolia's assertion that under Colorado case law, the DBA
 was part of a "network of contracts" between the
 parties extending back to the Bench Scale Proposal and LNTPs,
 such that any misrepresentations occurred during the course
 of contract performance. The court distinguished the case law
 on which Veolia had relied, finding that the DBA was not a
 part of a network of interrelated contracts. Rather, it was
 the governing

 contract, and it was not entered into until after the
 pertinent misrepresentations were made.

 ¶23
 In light of the foregoing findings, the trial court
 ultimately ordered Veolia to pay Antero $215.2 million in
 damages. The court also awarded Antero attorney fees under
 the DBA's fee-shifting clause, which provided, among
 other things, that the prevailing party in a lawsuit arising
 out of or in connection with the DBA was entitled to recover
 its reasonable attorney fees.

 ¶24
 Veolia appealed, arguing, among other things, that the trial
 court had erred in finding that the economic loss rule did
 not bar Antero's fraud claims. A division of the court of
 appeals affirmed the trial court's judgment, but on
 different grounds. Veolia Water Techs., Inc. v. Antero
 Treatment LLC, 2024 COA 126, ¶¶ 2, 95, 157,
 564 P.3d 1089, 1095, 1108, 1117.

 ¶25
 In its analysis, the division determined, contrary to the
 trial court, that the Bench Scale Proposal, LNTPs, and DBA
 functioned as an interrelated network of contracts, such that
 Veolia's misrepresentations were made after the contracts
 were executed. Id. at ¶ 95, 564 P.3d at 1108.
The division further determined, however, that the economic
 loss rule did not bar Antero's fraud claims because the
 DBA excepted such claims in its damages cap provision and the
 tort duties that Veolia had violated were independent of its
 contractual duties. Id. at ¶ 107, 564 P.3d at
 1110.

 ¶26
 On this latter point, the division concluded that
 Veolia's duty to refrain from fraudulently concealing or
 misrepresenting material facts was independent of
 Veolia's implied duty of good faith and fair dealing in
 the allegedly interrelated contracts. Id. at ¶
 98, 564 P.3d at 1109. The division reasoned that the implied
 duty applies only to a party's discretionary authority to
 determine certain terms of a contract. Id. at ¶
 99, 564 P.3d at 1109. Here, however, Veolia had no discretion
 to modify the DBA's salt quality or power consumption
 guarantees. Id. at ¶¶ 100-01, 564 P.3d at
 1109. Accordingly, there was no overlap in Veolia's
 common law tort duty and its implied contractual duty.
Id. at ¶ 101, 564 P.3d at 1109. The division
 thus affirmed, albeit on other grounds, the trial court's
 determination that Antero's fraud claims were not barred
 by the economic loss rule. Id. at ¶¶ 104,
 107, 564 P.3d at 1110.

 ¶27
 Veolia then petitioned this court for certiorari, and we
 granted its petition.

 II.
Analysis

 ¶28
We begin by setting forth the applicable standard of review.
We then discuss the pertinent principles of the economic loss
 rule. Finally, we apply these principles to the facts before
 us, ultimately concluding that Antero's fraudulent
 inducement claim is not barred by the economic loss rule.

 A.
Standard of Review

 ¶29
 The application of the economic loss rule presents a question
 of law that we review de novo. Mid-Century Ins. Co. v.
 HIVE Constr., Inc., 2025 CO 17, ¶ 21, 567 P.3d 153,
 158. We, however, defer to the trial court's factual
 findings unless they are clearly erroneous, and we will not
 overturn such factual findings unless they are unsupported by
 the record. Ralph L. Wadsworth Constr. Co. v. Reg'l
 Rail Partners, 2026 CO 19, ¶ 21, 587 P.3d 658, 663.

 B.
The Economic Loss Rule

 ¶30
 The economic loss rule developed to maintain the boundary
 between contract and tort law. Town of Alma v. AZCO
 Constr., Inc., 10 P.3d 1256, 1259 (Colo. 2000). Under
 the rule, a party that suffers only economic loss from the
 breach of an express or implied contractual duty may not
 assert a tort claim for that breach absent an independent
 duty of care under tort law. Id. at 1264. The rule
 thus serves to enforce the expectancy interests created by
 the parties' contractual promises so that the parties may
 allocate risks and costs during bargaining, and it ensures
 predictability in commercial transactions. Id. at
 1262.

 ¶31
 To determine whether the economic loss rule applies, courts
 look not to the nature of the damages but to the source of
 the duty allegedly breached, i.e., the contract or some other
 source. Mid-Century Ins., ¶ 24, 567 P.3d at
 158. To do so, courts consider whether (1) the relief sought
 in tort is the same as the contractual

 relief; (2) there exists a recognized common law duty of care
 in tort; and (3) the tort and contractual duties differ in
 any way. Id. at ¶ 25, 567 P.3d at 158. "If
 the parties have memorialized the applicable duty of care in
 their contract (i.e., if the duty is contained within or
 imposed under the contract), then no duty exists independent
 of the contract, and the economic loss rule will apply to bar
 a tort claim." Id. If, however, a recognized
 common law tort duty exists independent of any contractual
 obligations, then the economic loss rule does not apply and
 does not bar a tort claim asserting a violation of that
 independent duty of care. See Town of Alma, 10 P.3d
 at 1263.

 ¶32
 Applying these principles, we concluded in Van Rees v.
 Unleaded Software, Inc., 2016 CO 51, ¶ 15, 373 P.3d
 603, 607, that tort claims based on misrepresentations made
 prior to the formation of a contract and that allegedly
 induced the plaintiff to enter into that contract violated an
 independent duty in tort and, thus, such claims were not
 barred by the economic loss rule. In so concluding, we
 observed that an important distinction exists between
 "failure to perform the contract itself, and promises
 that induce a party to enter into a contract in the first
 place." Id. at ¶ 13, 373 P.3d at 607.

 ¶33
 Although questions regarding the application of the economic
 loss rule frequently arise in disputes involving one-to-one
 contractual relationships, "[c]ontractual duties arise
 just as surely from networks of interrelated contracts as

 from two-party agreements." BRW, Inc. v. Dufficy
 &Sons, Inc., 99 P.3d 66, 72 (Colo. 2004).

 ¶34
 With these principles in mind, we turn to the facts before
 us.

 C.
Application

 ¶35
 Veolia contends that the economic loss rule bars Antero's
 fraud claims because (1) Veolia and Antero were parties to a
 network of interrelated contracts that established a broad
 and ongoing contractual relationship; and (2) any
 misrepresentations were made in the course of that
 relationship and were therefore governed by the parties'
 contractual duties, particularly the implied covenant of good
 faith and fair dealing. We disagree with each premise of
 Veolia's argument, and thus we disagree with Veolia's
 conclusion.

 ¶36
 As an initial matter, we disagree with Veolia's assertion
 that Veolia and Antero were parties to a network of
 interrelated contracts for purposes of the economic loss
 rule. As noted above, the parties entered into a series of
 distinct and stand-alone contracts, none of which obligated
 either party to proceed to a subsequent contract.
Specifically, under the Bench Scale Proposal, Veolia agreed
 to conduct a study and preliminary engineering for Clearwater
 to validate the process design and confirm Veolia's
 proposed treatment approach. Nothing obligated either party
 to proceed thereafter. Similarly, the LNTPs obligated Veolia
 to conduct additional design work. Again, however, nothing in
 those LNTPs

 obligated the parties to proceed further. The DBA then
 followed as a stand-alone agreement.

 ¶37
BRW, 99 P.3d at 72-74, on which Veolia principally
 relies in arguing that the contracts at issue comprised a
 network of interrelated contracts, is distinguishable. In
 BRW, we addressed whether the economic loss rule
 applied in a tort suit for claims of negligent breach of a
 duty and negligent misrepresentation brought by a
 subcontractor against a design engineer and its agent when no
 contract existed between the subcontractor and those parties.
Id. at 67 &n.1. We began by noting that multiple
 parties are frequently involved in large construction
 projects and that "[t]hese parties typically rely on a
 network of contracts to allocate their risks, duties, and
 remedies." Id. at 72. We further observed that
 in this context, the parties have the opportunity to define
 their rights and remedies in a contractual relationship.
Id. Thus, even though a subcontractor might not have
 the opportunity to negotiate directly with the engineer or
 architect, it has the chance to allocate the risks of
 following specified plans when it contracts with a party
 involved in the network of contracts. Id. In this
 way, the "application of the economic loss rule
 encourages a subcontractor to protect itself from risks,
 holds the parties to the terms of their bargain, enforces
 their expectancy interests, and maintains the boundary
 between contract and tort law." Id.

 ¶38
 Applying these principles to the facts in that case, we
 observed that the interrelated contracts at issue contained
 the duties of care owed by the engineer and its agent and
 that the subcontractor's remedies therefore existed in
 contract. Id. at 74. Accordingly, we concluded that
 the economic loss rule barred the subcontractor's
 negligence claims against the engineer and its agent.
Id.; see also S K Peightal Eng'rs, LTD v.
 Mid Valley Real Est. Sols. V, LLC, 2015 CO 7, ¶ 10,
 342 P.3d 868, 872-73 (concluding, in a case in which a
 later-created entity that acquired title to a spec home sued
 two soil engineers that had subcontracts with the home's
 developer but not with the entity, that the economic loss
 rule could apply to an entity that did not exist at the time
 the contracts containing the duties at issue were formed if
 that entity was a party to or a third-party beneficiary of
 the contract or an interrelated contract).

 ¶39
 Unlike BRW, this case does not involve multiple
 parties entering into a network of interlocking contracts to
 perform a large transaction or project and in which certain
 of the parties contracted directly with some but not all of
 the other parties. Rather, this case involves two parties
 that entered into a series of contracts with each other.
Moreover, the parties' contracts were not interlocking
 agreements forming parts of a larger transaction or project.
To the contrary, although the Bench Scale Proposal and LNTPs
 were related to the DBA, the DBA was a stand-alone,
 fully integrated agreement governing the construction of

 Clearwater, and, thus, it constituted its own distinct and
 separate transaction. Our case law on the interrelated
 contracts doctrine is therefore inapposite here.

 ¶40
 Notwithstanding Veolia's assertion to the contrary, the
 DBA's integration clause does not establish otherwise. As
 noted above, that clause merely restated as duties under the
 DBA duties that the parties had undertaken in their prior
 agreements. The parties, however, were not required to
 incorporate those duties into the DBA. They did so after
 separately negotiating the latter agreement.

 ¶41
 Nor are we persuaded by Veolia's reliance on Dream
 Finders Homes LLC v. Weyerhaeuser NR Co., 2021 COA 143,
 506 P.3d 108. In that case, a division of our court of
 appeals expanded the interrelated contracts doctrine beyond
 the context of a complex, multi-party, interrelated
 transaction in which no contract existed between certain of
 the parties to the transaction. Id. at ¶¶
 45-48, 506 P.3d at 119-20. We have not explicitly endorsed
 such an approach. Even if we did, however, Dream
 Finders, too, is distinguishable.

 ¶42
Dream Finders involved a scenario in which none of a
 series of documents between and among a joist manufacturer,
 its distributor, and joist purchasers set forth all of the
 terms and conditions of the parties' purchase agreement.
Id. at ¶¶ 46-47, 506 P.3d at 119. In these
 circumstances, the division agreed with the joist
 manufacturer that the documents constituted a single
 agreement governing the sales of the joists. Id. at
 ¶ 48, 506 P.3d at 120. Having thus concluded, the

 division further determined that any misrepresentations
 alleged by the purchasers were post-contractual (because the
 misrepresentations occurred after the earliest of the
 documents on which the parties had agreed). Id. at
 ¶¶ 50-52, 506 P.3d at 120. And because the tort
 duties alleged by the purchasers to have been breached
 mirrored the duties set forth in the parties' contract,
 the economic loss rule barred the purchasers'
 misrepresentation and fraudulent concealment claims.
Id. at ¶¶ 53-83, 506 P.3d at 120-26.

 ¶43
 Here, unlike in Dream Finders, Veolia does not
 allege that the DBA failed to include all of the terms of the
 parties' agreement. Indeed, it appears undisputed that
 the DBA represented a complete recitation of the parties'
 agreement for Clearwater's construction. Accordingly,
 even if the Dream Finders division's
 understanding of the interrelated contracts doctrine were
 correct—an issue that we need not address
 here—that case does not assist Veolia.

 ¶44
 Lastly, we note that were we to accept Veolia's argument
 that the contracts in this case were interrelated such that
 they constitute a broad and ongoing contractual relationship,
 the economic loss rule would essentially bar fraud claims
 whenever parties happen to have had a preexisting contractual
 relationship relating to a particular project or undertaking.
Such a rule would require contracting parties to bargain
 preemptively to allocate risks and costs for

 unknown future contracts. We have never extended the economic
 loss rule or the interrelated contracts doctrine that far,
 and we decline to do so now.

 ¶45
 For these reasons, we conclude that Veolia and Antero were
 not parties to a network of interrelated contracts
 establishing an ongoing contractual relationship that
 subsumed the violation of a duty to refrain from fraudulent
 misrepresentations. (To the extent that the division below
 concluded that Veolia and Antero were parties to a network of
 interrelated contracts under BRW, we respectfully
 disagree with that conclusion.) Rather, the parties signed a
 series of independent agreements, and the pertinent
 misrepresentations occurred prior to, and, on the facts
 presented, induced Antero to enter into, the DBA.
Specifically, Veolia failed to disclose its inability to meet
 Antero's power consumption requirements prior to the
 execution of the DBA. And as the trial court found, with
 ample record support, the power consumption guarantee was
 critical to Antero and without that guarantee, Antero would
 not have signed the DBA.

 ¶46
 In short, the facts before us demonstrate that Antero's
 fraud claim amounts to a straightforward fraudulent
 inducement claim. Accordingly, we conclude that Van
 Rees, ¶¶ 13-15, 373 P.3d at 607, controls and,
 therefore, the economic loss rule does not bar that claim.

 ¶47
 In light of this determination, we need not address whether
 Veolia also fraudulently induced Antero to sign Change Order
 1. But for the fraudulent

 inducement of the DBA, the parties would not have been in a
 position to agree to Change Order 1.

 ¶48
 Finally, we note that even if Veolia's misrepresentations
 and fraudulent concealment could be said to have been
 post-contractual, we would reach the same result because, as
 the division below opined, the covenant of good faith and
 fair dealing, on which Veolia relies, does not apply to
 nondiscretionary contract terms like those at issue here.
See Veolia Water Techs., ¶¶ 99-101, 564
 P.3d at 1109. Thus, Antero would not have a viable claim for
 breach of that implied covenant. See id.

 ¶49
 Specifically, as noted above, Veolia contends that if its
 misrepresentations were post-contractual, then any tort duty
 to refrain from such misrepresentations would be subsumed by
 either its express or implied contractual duties and barred
 by the economic loss rule. Here, however, the parties'
 agreements did not contain any express duties to refrain from
 making misrepresentations. In fact, the DBA explicitly
 contemplated the parties' ability to bring separate
 claims for fraud, given the damages cap exception for
 "gross negligence, fraud or willful misconduct."
Accordingly, if Veolia had a contractual duty to refrain from
 making misrepresentations, then that duty had to arise, if at
 all, from the contract's implied covenant of good faith
 and fair dealing. See Former TCHR, LLC v. First Hand
 Mgmt. LLC, 2012 COA 129, ¶ 29, 317 P.3d 1226, 1232
(concluding that the disclosure duties that the plaintiff
 claimed to have been breached arose from and were

 expressly described by the parties' preexisting agreement
 or were subsumed within that agreement's implied covenant
 of good faith and fair dealing); Hamon Contractors, Inc.
 v. Carter &Burgess, Inc., 229 P.3d 282, 289
(Colo.App. 2009) (noting that the implied covenant of good
 faith and fair dealing prohibits fraud in the performance of
 contractual obligations as to which a party has discretionary
 authority and, thus, the covenant may preclude fraud claims
 arising out of the party's contractual performance).

 ¶50
 As we have previously recognized, however, "[t]he duty
 of good faith and fair dealing applies when one party has
 discretionary authority to determine certain terms
 of the contract, such as quantity, price, or time."
Amoco Oil Co. v. Ervin, 908 P.2d 493, 498 (Colo.
1995) (emphasis added). In this context, "discretionary
 authority" refers to a party's ability after
 contract formation to set or control the terms of
 performance, and discretion occurs when, at contract
 formation, the parties defer a decision regarding performance
 terms of the contract. Id.

 ¶51
 Here, as the division below observed, Veolia had no
 discretion to modify Clearwater's core requirements under
 the DBA (e.g., the salt quality requirements or power
 guarantees) without Antero's written consent. Veolia
 Water Techs., ¶¶ 100-01, 564 P.3d at 1109. As
 a result, under the settled law described above, Veolia did
 not owe Antero an implied contractual duty to refrain from
 making misrepresentations regarding these matters.
Consequently, even if Veolia's

 misrepresentations were post-contractual, no contractual duty
 would have subsumed Veolia's common law tort duty to
 refrain from making misrepresentations, and the economic loss
 rule still would not bar Antero's fraud claim. See
Town of Alma, 10 P.3d at 1263 (noting that the economic
 loss rule does not apply when the court has recognized the
 existence of a duty independent of any contractual
 obligations).

 III.
Conclusion

 ¶52
 For the foregoing reasons, we conclude that (1) the
 interrelated contracts doctrine does not apply to a series of
 contracts between two parties when each contract represents a
 stand-alone transaction and (2) the fraud alleged here
 occurred prior to the formation of the DBA and, on the facts
 presented, induced Antero to sign that contract. Accordingly,
 under Van Rees, ¶¶ 13-15, 373 P.3d at 607,
 the economic loss rule does not bar Antero's fraud claim
 in this case.

 ¶53
We therefore affirm the division's judgment below, albeit
 on other grounds, and we remand this case with instructions
 that the case be returned to the trial court for a
 determination of the reasonable attorney fees to be awarded
 to Antero pursuant to the DBA's fee-shifting provision.